OFFICE OF EQUAL EMPLOYMENT OPPORTUNITY AFFAIRS
FEDERAL BUREAU OF INVESTIGATION
WASHINGTON, D.C.

**ROBYN LEE GRITZ**

**COMPLAINT OF DISCRIMINATION**

**FBI-2012-00263**

**BASED ON SEX (FEMALE), AGE (DOB: JANUARY 21,
1969), DISABILITY (MENTAL) AND REPRISAL**

**REPORT OF INVESTIGATION**

INVESTIGATIVE REPORT OF
SUPERVISORY SPECIAL AGENT LAURA L. HENRY
FEDERAL BUREAU OF INVESTIGATION

EXHIBIT B

**TABLE OF CONTENTS**

                                                                EXHIBIT

INVESTIGATIVE SUMMARY . . . . . . . . . . . . . . . . . . . .  1
     Description of Complaint
     Accepted Issues for Investigation
     Corrective Action Sought
     Details of the Investigation

COMPLAINT  . . . . . . . . . . . . . . . . . . . . . . . . . .  2

COUNSELOR'S REPORT . . . . . . . . . . . . . . . . . . . . . .  3

WITNESS KEY  . . . . . . . . . . . . . . . . . . . . . . . . .  4

WITNESSES NOT INTERVIEWED . . . . . . . . . . . . . . . . . .  4A

RECEIPT OF COMPLAINT ACKNOWLEDGED  . . . . . . . . . . . . . .  5

COMPLAINT ACCEPTED AND ISSUES DEFINED . . . . . . . . . . . .  6

INVESTIGATION ASSIGNED . . . . . . . . . . . . . . . . . . . .  7

DOCUMENTARY EVIDENCE STATEMENT OF AUTHENTICITY . . . . . .  8

**SIGNED SWORN STATEMENTS**

GRITZ ROBYN LEE (Complainant), Supervisory Special Agent,
     Counterterrorism Division, Federal Bureau of
     Investigation (FBI) . . . . . . . . . . . . . . . . . .  9

SCHWEIN, RICHARD D., JR., Special Agent in Charge,
     Birmingham Division, FBI . . . . . . . . . . . . . . .  10

PETROWSKI, THOMAS D. Acting Section Chief, Counterterrorism
     Division, FBI . . . . . . . . . . . . . . . . . . . . .  11

PERDUE, GARY DOUGLAS, Special Agent in Charge, Pittsburgh
     Division, FBI . . . . . . . . . . . . . . . . . . . . .  12

LEY, JENNIFER, E., Deputy Assistant Director,
     Counterterrorism Division, FBI . . . . . . . . . . . .  13

EXHIBIT B

## SIGNED SWORN STATEMENTS (Continued)

MCCABE, ANDREW G., Assistant Director, Counterterrorism,
FBI . . . . . . . . . . . . . . . . . . . . . . . .   14

## DOCUMENTS

Medical documentation provided by Robyn L. Gritz . . . . .   15

Fitness for duty medical documentation dated December 11,
2012, and January 10, 2013. . . . . . . . . . . . . .   16

Performance Plan for Supervisory Special Agent, GS-15,
signed and dated by Robyn L. Gritz on February 6,
2012 . . . . . . . . . . . . . . . . . . . . . . . .   17

Series of e-mails dated February 15 - 16, 2012, between
Robyn L. Gritz and Richard D. Schwein, Jr. . . . . . .   18

Series of e-mails dated April 25, 2012, between Robyn
L. Gritz and Richard Schwein . . . . . . . . . . . .   19

Series of e-mails dated May 14 - 16, 2012, between Robyn
L. Gritz and Thomas D. Petrowski; e-mail forwarded
from Robyn L. Gritz to Richard Schwein . . . . . . . .   20

FD-865 Performance Summary Assessment signed and dated
by Robyn L. Gritz on May 17, 2012 . . . . . . . . . .   21

Series of e-mails dated May 17 - 18, 2012, between Robyn
L. Gritz and Richard D. Schwein, Jr., entitled
"Re: Psychology" . . . . . . . . . . . . . . . . . .   22

Series of e-mails dated May 31, 2012, between Robyn L.
Gritz and Richard D. Schwein, Jr. . . . . . . . . . .   23

E-mail dated June 13, 2012, from Thomas D. Petrowski to
Richard D. Schwein" . . . . . . . . . . . . . . . . .   24

Series of e-mails dated June 14, 2012, between Thomas D.
Petrowski and Richard D. Schwein . . . . . . . . . . .   25

E-mail dated June 16, 2012, from Robyn L. Gritz to
Andrew G. McCabe and reply . . . . . . . . . . . . . .   26

EXHIBIT B

## DOCUMENTS (Continued)

Electronic Communication (EC) dated June 20, 2012, from
    Counterterrorism Division to the Inspection Division
    and Security Division regarding referral of personnel
    security issues relating to Robyn Gritz . . . . . . .   27

Management Referral Letter dated June 20, 2012, from
    Richard D. Schewin, Jr. to Robyn L. Gritz . . . . .    28

Letter of Requirement dated June 20, 2012, from Richard D.
    Schwein, Jr. to Robyn L. Gritz . . . . . . . . . . .   29

Series of e-mails dated June 26, 2012, and June 28, 2012,
    between Thomas D. Petrowski and Richard Schwein . . .   30

Richard D. Schwein, Jr.'s handwritten documentation dated
    February 1, 2012, to July 1, 2012, regarding Robyn L.
    Gritz . . . . . . . . . . . . . . . . . . . . . . .   31

FD-728.1 Performance Appraisal Report, rating of record
    ending September 30, 2012, signed and dated by
    Robyn L. Gritz on October 26, 2012 . . . . . . . . .   32

Robyn L. Gritz's PAR Grievance dated November 1, 2012 . . .   33

Twenty-five e-mails dated January 17, 2012, to May 10,
    2012, from Robyn L. Gritz to Richard D. Schwein, Jr.
    relevant to her tardiness and/or absenteeism . . . . .   34

Memorandum to All Employees entitled, "Policy on Harassment"
    dated February 14, 2005, from Director Robert S.
    Mueller, III . . . . . . . . . . . . . . . . . . . .   35

Electronic Communication dated December 27, 2004, from
    Director's Office to All Divisions, entitled "OFFICE
    OF EQUAL EMPLOYMENT OPPORTUNITY AFFAIRS (OEEOA):
    PROCEDURES TO FACILITATE THE PROVISION OF REASONABLE
    ACCOMMODATION" . . . . . . . . . . . . . . . . . . .   36

Corporate Policy Notice #0043N dated April 30, 2008,
    entitled "Performance Appraisal System,"
    effective end date December 7, 2012 . . . . . . . . .   37

3

EXHIBIT B

## DOCUMENTS (Continued)

Corporate Policy Notice #0489PG dated May 2, 2012,
     entitled "Performance Appraisal System, Policy
     Implementation Guide" . . . . . . . . . . . . . . .   38

Corporate Policy Notice #0526PG dated July 30, 2012,
     entitled "Detailee and Joint Duty Program, Policy
     Implementation Guide" . . . . . . . . . . . . . . .   39

Corporate Policy Notice #0296N dated November 19, 2010,
     entitled "Reintegration of FBI Employees after a
     Detailee Assignment," effective end date November
     19, 2012 . . . . . . . . . . . . . . . . . . . . . .   40

Electronic Communication dated March 8, 2013, from
     Supervisory Special Agent Laura L. Henry to the
     OEEOA, entitled "ROBYN LEE GRITZ, SUPERVISORY
     SPECIAL AGENT, COMPLAINT OF DISCRIMINATION, BASED ON
     SEX (FEMALE), AGE (DOB: JANUARY 21, 1969), DISABILITY
     (MENTAL) AND REPRISAL, COUNTERTERRORISM DIVISION,"
     Comparative Data . . . . . . . . . . . . . . . . . .   41

EXHIBIT B

CLASSIFIED BY NSICG/J8J67T35
REASON: 1.4 (c)
DECLASSIFY ON: 06-04-2040
DATE: 06-04-2015

Case 1:18-cv-02712-KBJ   Document 19-5   Filed 09/19/19   Page 6 of 44

ALL INFORMATION CONTAINED
HEREIN IS UNCLASSIFIED EXCEPT
WHERE SHOWN OTHERWISE

# INVESTIGATIVE SUMMARY

ROBYN LEE GRITZ

COMPLAINT OF EMPLOYMENT DISCRIMINATION

FBI-2012-00263

## DESCRIPTION OF COMPLAINT

On September 14, 2012, Robyn Lee Gritz, a Supervisory Special Agent (SSA), assigned to the Counterterrorism Division (CTD) of the Federal Bureau of Investigation (FBI), filed a complaint of discrimination alleging she was discriminated against based on her sex (female), age (DOB: January 21, 1969), disability (mental), and reprisal by FBI management when, among other things, after July 22, 2012, she was removed from her GS-15 Senior Detailee position and reassigned to another supervisory position; and on July 31, 2012, she was notified that an Internal Investigation Section investigation had been initiated against her for time and attendance fraud; insubordination for repeatedly failing to attend meetings; and sending unprofessional e-mails.  Exhibit (Ex.) 2.

## ACCEPTED ISSUE FOR INVESTIGATION

By letter dated December 21, 2012, from the FBI's Office of Equal Employment Opportunity Affairs (OEEOA), Gritz was advised that the allegations accepted for

1

EXHIBIT B

SECRET

investigation are: whether she was subjected to a hostile
work environment and discriminated against based on sex
(female), age (DOB: January 21, 1969), disability (mental)
and reprisal for EEO activity when: 1) sometime prior to
January 2012, her former Section Chief (SC) shared
confidential information regarding her mental health, time
and attendance and personal relationships with her SC prior
to her reporting as a Detailee to the Central Intelligence
Agency (CIA); 2) since January 2012, she has not been
tasked to serve in a senior management acting assignment;
3) during her assignment with the CIA in January 2012, she
was constantly told that she was emotional and could not
handle being a detailee, she was never introduced to Senior
Executive Service employees; male colleagues made
derogatory comments about her aggressive approach to cases;
and she was not included in senior level meetings at the
CIA; 4) the acting Deputy Director (DD) for Law Enforcement
undermined and degraded her authority and reputation, tried
to intimidate and threaten her, worked her areas of
responsibility without notifying her and scrutinized her
work performance; 5) on May 17, 2012, the SC and acting DD
cited mental health issues in her mid-year review and
continuously advised her to step down and take a less
stressful position; 6) on June 7, 2012, although she

2

EXHIBIT B

SE CRET

advised the acting DD that she would be attending a conference in Virginia Beach, he questioned others about her whereabouts and complained that her travel should have taken three instead of six hours; 7) on June 20, 2012, she was referred to the Employee Assistance Program based on false and misleading information; 8) on June 20, 2012, the SC advised her of her need to improve in the area of Critical Element 3 of her work performance, regarding providing a professional service and relating with others; 9) after July 22, 2012, she was removed from her position as the Senior Detailee to the CIA and placed in a position not equitable to her rank and experience; 10) from July 23, 2012 through August 2012, she was not provided with a performance plan, nor a white paper for inclusion in her Performance Appraisal Report; and 11) on July 31, 2012, she was notified that an Internal Investigations Section, Inspection Division investigation had been initiated against her for time and attendance fraud, insubordination for repeatedly failing to attend meetings and sending unprofessional e-mails. Ex. 6.

### CORRECTIVE ACTION SOUGHT

Gritz seeks the following corrective action: 1) the comments on her PAR removed; 2) to be transferred to another (agreed upon) division; 3) a clean record (no OPR);

3

SE RET

EXHIBIT B

SECRET

4) rescission of referral to EAP; 5) rescission of OPR investigation; 6) attorney's fees; 7) compensatory damages; 8) restoration of sick and annual leave taken as a result of the stress; and 9) any other remedy under the law. Ex. 9.

## DETAILS OF THE INVESTIGATION

**Robyn Lee Gritz** (Sex: female; DOB: January 21, 1969; Disability: mental), Supervisory Special Agent (SSA), Counterterrorism Division (CTD), Operations Branch III, stated she has been in her current position since July 5, 2012. Ex. 9. Gritz advised that from January 11, 2012, to July 5, 2012, she was assigned as a GS-15 SSA Senior Detailee within the Detailee Section of CTD and was detailed to the Central Intelligence Agency's Counterterrorism Center (CIA/CTC),                    (A)                    (S)

(S)          (A)          . She stated that during the period of time she was assigned to the Detailee Section, Richard D. Schwein, Jr., then the Section Chief (SC) of the Detailee Section, was her immediate supervisor. Ex. 9.

Gritz stated she has adjustment disorder with mixed anxiety and depressed mood, carpal tunnel and insomnia. Ex. 15. She stated her current hostile work environment has increased her physical ailments, to include stomach pains and anxiety. Gritz stated that from the time she

4

SECRET

EXHIBIT B

reported to the Detailee Section, Schwein and Thomas D.
Petrowski, Acting Section Chief (Acting SC) of the Detailee
Section, perceived her as having a mental disability.  She
stated Schwein referred her to the Employee Assistance
Program (EAP) because he perceived her as having a mental
disability.  Gritz stated Schwein told her that he had
learned from Gary Douglas Perdue, who was then a SC
assigned to the Weapons of Mass Destruction Directorate
(WMDD), that she had mental health issues and attendance
issues while she was assigned to the WMDD.  Gritz stated
Perdue was never in her chain-of-command and had violated
her privacy by sharing this information regarding her
mental health with Schwein.  She stated Schwein used this
information to later remove her from her position as a
Senior Detailee and to damage her reputation.  Ex. 9.

Gritz stated her work relationship with Schwein was
initially positive, but then he began to undermine her and
not support her.  She stated she sent an e-mail to Schwein
on May 25, 2012, and told him that she felt he did not
support her and did not copy her on important e-mails on
matters within her area of responsibility (AOR).  She
stated Schwein also did not support her regarding a
personnel issue she had with Unit Chief (UC) Janelle
Miller.  Gritz explained that Miller consistently avoided

EXHIBIT B

SECRET

and misguided her on operational matters.  Gritz stated
Schwein agreed with her about this personnel issue, but
reprimanded her in an e-mail about it.  Exs. 18, 19.  Gritz
stated Schwein also told her that she was emotional and
took things personally and cited this incident with Miller
in her Performance Appraisal Report (PAR) under Critical
Element (CE) 3, "Relating with Others and Providing
Professional Service." Ex. 32.  Gritz stated this is
significant gender communication stereotyping.  Exs. 9.

     Gritz advised that while Schwein was on a temporary
duty assignment (TDY) to the Minneapolis (MP) Division, he
designated Petrowski to be the Acting SC in his absence.
Gritz stated Petrowski undermined her and set her up for
failure by working matters in her AOR without discussing
them with her.  She stated Petrowski's lack of respect for
her, his undermining of her authority, and his belief that
she was of no value was made clear in his e-mails.  She
stated Petrowski excessively questioned her about two
conferences she attended, including a conference held in
Virginia Beach, VA.  Gritz explained that the conference
was sponsored by the Department of Defense and served as a
quarterly review of issues and operations in Yemen,
Somalia, and surrounding areas.  She explained that after

(S) her attendance was approved by (A) she attempted to notify

6

EXHIBIT B

SECRET

SE RET

Petrowski at an internal meeting.  Gritz stated Petrowski cut her off in the middle of briefing him.  She stated she subsequently went to Petrowski's office to advise him of the conference, but he was on the phone with his office door shut.  She stated that after he completed his phone call, Petrowski departed for a dentist appointment.  Gritz stated she told Petrowski that her attendance at this conference was approved.  She added that while she was at the conference, Petrowski conducted a MapQuest search from her residence to Virginia Beach; asked fellow detailees why she had travelled to Virginia Beach; and claimed that she left no one to cover her responsibilities.  Gritz explained

(S)    she delegated her responsibilities to detailee Joe Doran and had notified (A) and FBI personnel.  Ex. 9.

Gritz stated that upon her return to the office the following week, Petrowski confronted her and told her that she did not have proper FBI authorization to attend the conference and accused her of trying to "get one over on him."  Gritz stated Petrowski later misrepresented this matter to Schwein, CTD Executive Management (EM), the (A) (S) Chief, the Office of Professional Responsibility (OPR), and the Employee Assistance Program (EAP).  Ex. 9.

Gritz stated Petrowski also "cut" her out of e-mails, which she found extremely insulting.  She stated Petrowski

7

EXHIBIT B

SE RET

SERET

did not want her name associated with any pivotal operation
or inquiry without his view of it.  She stated she found it
demeaning for a senior GS-15 with significant CT and
operational experience.  Ex. 9.

Gritz advised that on June 22, 2012, she went to the
Potomac Hospital after having severe chest pains.  She
stated she sent an e-mail to Petrowski and informed him
that she would be unable to attend the 7:15 a.m. meeting.
She stated Petrowski replied, "Robyn – I note that you're
still not here, despite comments below and the written
notice provided to you last week.  Please find me as soon
as you get in."  Gritz stated Petrowski used bullying
behavior when he addressed her and tried to intimidate her
for doing her job proficiently.  She stated Petrowski
continued his degradation of her character after Schwein
departed for a TDY to the MP Division.  She added that
Petrowski never designated her as Acting SC, and used the
excuse that he could not rely on her because she had
excessive tardiness.  Ex. 9.

Gritz recalled that during a phone conversation with
Schwein on June 14, 2012, Schwein threatened to pull her
time badge after she asked for the Ombudsman to be present
during future meetings.  Gritz explained that Petrowski and
Schwein failed to recognize that she had tailored her work

EXHIBIT B

SERET

SECRET

(S)

schedule to allow her to be engaged with the (A)   She

stated she was unaware there was a concern that her time

and attendance had fraud implications.  She added that she

was never counseled and did not receive oral or written

warnings.  Ex. 9.

Gritz stated that prior to departing for his TDY,

Schwein left her mid-year Performance Summary Assessment

(PSA) dated May 7, 2012, in a folder for her review.  She

stated she reviewed the PSA and signed it on May 17, 2012.

Ex. 21.

Gritz stated she received an e-mail from Schwein on

June 19, 2012, to "remind her" of a video teleconference

scheduled the next day.  Gritz stated she expected she

would be afforded time to get her performance data together

for any "meeting" regarding her performance.  She stated

the meeting turned out to be an EAP Management Referral by

Schwein and Petrowski.  Gritz stated she asked Leslie

Rogers, CTD's EAP Counselor, to attend the meeting.  Gritz

explained that she felt the filing of the OPR, specifically

the timeline, and notes contained in her drop folder

clearly indicate that Schwein and Petrowski targeted her

for months in an attempt to make "a case" on her.  Ex. 9.

Gritz recalled that on July 5, 2012, she was removed

from her position as a GS-15 Senior Detailee and reassigned

9

SECRET

EXHIBIT B

SECRET

to an SSA position within CTD's Operations Branch III.   She
stated she was not given a new Performance Plan within 30
days, as required by FBI and OPM policy.   Ex. 17.   She
stated she felt she was reassigned in retaliation for
filing an EEO complaint.   She recalled that on July 3,
2012, Jennifer E. Ley, Deputy Assistant Director (DAD),
CTD, told her that she had been taken "out of the
situation" due to her health, and that it was at the
direction of Andrew G. McCabe, Assistant Director (AD),
CTD.   Gritz stated she advised Ley that she did not want
Schwein to have anything to do with her Performance
Appraisal Report (PAR).   However, she stated Schwein
subjected her to a failed PAR.   Gritz pointed out that
Schwein was her immediate supervisor for barely half of the
rating period and should not have written her PAR.   She
stated she filed a grievance on November 9, 2012.   Ex. 33.
Gritz stated she received notification on November 21,
2012, that McCabe denied her grievance because there was
not enough justification to change the rating.   Ex. 9.

   **Richard D. Schwein, Jr.** (Sex: male; DOB: (S)
1961; no disability claimed), Special Agent in charge
(SAC), Birmingham Division, stated he has been in his
current position since November 2012.   Ex. 10.   Schwein
advised that based on personal observation, he perceives

10

SECRET

EXHIBIT B

SECRET

Gritz to be a female in her early forties. He recalled that in February 2012, Gritz informed him that she had previously engaged the services of EAP and a mental health professional. Schwein stated Gritz never provided any medical documentation to him or shared any information with him indicating she has a disability (mental). Schwein stated he first became aware of Gritz's participation in EEO protected activity when he was contacted by an EEO Counselor on August 9, 2012. Ex. 10.

Schwein advised that from February 2011, to November 2012, he was assigned to CTD as the SC of the Detailee Section and was detailed to the CIA/CTC as the Deputy Director for Law Enforcement. He advised that the Detailee Section serves as a conduit between the FBI's CTD and the CIA/CTC in operational matters. He added that the Detailee Section deals with the most important CT issues faced by the U.S. Government and serves as a critical liaison between the FBI and the CIA. Schwein stated that during the period of time in question, his section consisted of two Intelligence Analysts (IA), three GS-14 SSAs, and three GS-15 SSA Senior Detailees, including Gritz, Petrowski, and Ricky Hill (retired). He stated most of the work done by the Detailee Section is conducted at CIA Headquarters

SECRET

EXHIBIT B

(CIAHQ), located in Langley, VA, and at [ (S) ]
(LX-1), located in McLean, VA.   Ex. 10.

        Schwein stated the work environment in the Detailee
Section and within CTD in general, is high-volume and high
stress, with typically long hours and occasional weekends.
He stated the normal workday for the staff in the section
begins early to prepare for the 7:15 a.m. Director's pre-
brief meeting.  Schwein explained that the 7:15 a.m.
meeting identifies what the FBI is monitoring with regard
to CT matters throughout the world.  He explained that he
instituted a requirement for all of the GS-15 Senior
Detailees to attend the 7:15 a.m. meeting in order to
understand FBI priorities and to understand what is being
briefed to the Director.  He added that the meeting is held
at LX-1, and concurrently via secure video teleconferencing
(SVTC) at CIA/CTC.  Schwein stated there are other meetings
throughout the day, to include a 9:00 a.m. meeting at the
CIA/CTC with the executive staff.  Ex. 10.

        Schwein recalled that in late 2011, he had openings
for Senior Detailee positions at the GS-15 level in his
section.  He stated Gritz was one of the candidates that he
interviewed for the position.  Schwein stated Gritz had a
strong resume and did well in the interview, and he
subsequently selected her for a position as a Senior

12

EXHIBIT B

(S)

Detailee assigned to the    (A)    He stated he also selected

Petrowski for a position as a Senior Detailee assigned to

the Global Jihad Department.  Schwein recalled that Gritz

and Petrowski reported to the Detailee Section in January

2012.  He stated Gritz worked for him from January 2012, to

early July 2012.  Ex. 10.

Schwein recalled that soon after Gritz and Petrowski

reported to the Detailee Section, he met with them and

emphasized the requirement to attend the 7:15 a.m. meeting.

He said he made it very clear what his expectations were,

and that missing the 7:15 a.m. meeting was by exception.

Schwein recalled that within the first two weeks of her

assignment, Gritz started to provide excuses for why she

could not get into work on time to attend the 7:15 a.m.

meeting.  Ex. 34.  He stated he began to monitor the

situation and had several in-person discussions with her

regarding her tardiness and absenteeism.  Ex. 10.

Schwein recalled that in early February 2012, after

Gritz had reported to the Detailee Section, he had a

telephone conversation with Perdue, who was then assigned

as a SC in the WMDD.  Schwein recalled that during the

conversation, Perdue asked him how Gritz was doing.

Schwein stated he told Perdue that Gritz was having

problems with attendance and not making it into work on

13

SEC RET

EXHIBIT B

SECRET

time to attend the 7:15 a.m. meeting.  He stated Perdue

shared with him that Gritz had a history of attendance and

tardiness issues during her previous assignment in the

WMDD.  Ex. 10.

     Schwein recalled that a few days after his

conversation with Perdue, Gritz shared with him that she

was having some emotional issues as the result of a divorce

and a recently failed relationship with a then unidentified

Navy Seal.  Schwein stated Gritz informed him that she had

engaged the EAP and had been seeing a health care

professional, but had not had contact with the EAP in more

than a year and was considering changing her health care

professional.  Schwein stated he was supportive and

informally recommended that Gritz re-engage the EAP.

Schwein stated that during the same conversation, he may

have said to Gritz that he understood or was aware that she

had had similar issues with getting to work on time while

she was assigned to the WMDD.  He stated that while it was

possible that he may have referenced his conversation with

Perdue as his reason for knowing these facts, he could not

recall.  Ex. 10.

     Schwein recalled that in March 2012, Gritz was still

engaging in a pattern of tardiness and absenteeism, and

still missing important meetings.  He stated he addressed

14

SECRET

EXHIBIT B

SECRET

(S) these issues again with Gritz. Schwein recalled that in early March 2012, during a conversation with the CIA senior

(S) executive serving as the (A) Chief, he asked how Gritz was doing. He stated the (A) Chief indicated that Gritz was gone a lot and spent a lot of time talking about herself and her personal life. Schwein explained that given

(S) Gritz's relatively short tenure in the unit, he decided to get additional feedback from the (A) Chief in 30 days and to continue to monitor the situation. Ex. 10.

Schwein stated that in April 2012, the (A) Chief (S) provided additional feedback about Gritz. He stated the

(S) (A) Chief shared with him that during a TDY to San Diego for some meetings between the CIA and the local FBI field office, the CIA team left Gritz out of meetings because the team was unhappy with her overall, and because she did not add any value to the mission. Schwein stated the (A) Chief (S) also voiced some concerns about Gritz's interpersonal skills. Ex. 10.

Schwein stated that other indicators of Gritz's lack of interpersonal skills were apparent in e-mails that she sent to individuals in the FBI and members of other government agencies. He stated he counseled Gritz for sending an inflammatory and highly unprofessional e-mail to Miller. Exs. 18, 19. Schwein stated Gritz also sent

SECRET

EXHIBIT B

SECRET

superfluous communications and unsolicited e-mails late at
night, many of which were not relevant to anything
operational and were unnecessary.  He stated he advised
Gritz that she needed to be more brief and upfront in
operational e-mails.  Exs. 10, 18, 19.

Schwein stated Gritz came to him in late April 2012,
and told him about her failed relationship with a Navy Seal
Officer identified as Captain John Burnham.  He stated
Gritz told him that she had recently learned about
Burnham's engagement to a CIA employee, and that she was
angry and emotional about the situation.  Schwein stated he
was aware that Burnham's fiancé was a CIA employee and
worked in the same building as Gritz.  He stated he told
Gritz that she needed to let it go and move on with her
life, and to leave Burnham and his fiancé alone.  Ex. 10.

Schwein stated he was aware that he had to address
Gritz's performance issues.  He stated he completed Gritz's
PSA on May 7, 2012, and indicated the areas which needed
improvement, including providing professional service and
her interpersonal skills.  Ex. 21.  He stated that in
addition to her performance issues, Gritz's tardiness and
absenteeism had been a problem.  Schwein stated he
addressed all of this in Gritz's PSA.  He stated he never
cited or made any reference to any mental health issue in

SECRET

EXHIBIT B

SECRET

Gritz's PSA.  Schwein stated that after he completed
Gritz's PSA, he planned to present it to her, however Gritz
did not show up for work on the day the appointment was
scheduled.  He stated he was unable to meet with Gritz to
discuss her PSA with her in person prior to departing for a
TDY to the MP Division.  He stated he left Gritz's PSA in
his office for her to review and sign.  Schwein stated
Gritz reviewed and signed the PSA after he departed for his
TDY.  He stated he received an e-mail from Gritz on May 17,
2012, indicating that she felt her PSA was "very fair," and
that she had expected it to be more critical than it was.
Ex. 10.

Schwein stated he served as Acting SAC of the MP
Division from May 11, 2012, to July 9, 2012.  He stated
that in his absence, he designated Petrowski to serve as
the Acting SC of his section.  He explained that the
decision was made purely on the basis of performance, and
had nothing to do with Gritz's sex, age, disability
(mental), or participation in the EEO process.  Schwein
explained that Petrowski never missed a 7:15 a.m. meeting
and had a better feel overall for the section.  He stated
he could not rely on Gritz to attend the necessary
meetings, and was not confident she could effectively and

SECRET

EXHIBIT B

professionally handle the additional responsibilities as
Acting SC.  Ex. 10.

Schwein recalled that sometime between May and July
2012, he had another conversation with Perdue.  He recalled
that during the conversation, Perdue asked about Gritz.  He
stated he informed Perdue that Gritz was continuing to have
problems, and that he was considering an EAP Managerial
Referral Letter, a Letter of Requirement (LOR), and placing
Gritz on a Performance Improvement Plan (PIP).  Schwein
stated Perdue indicated he was concerned about Gritz's
emotional well being, and expressed concern that she may
hurt herself, and suggested that he contact Laurie J.
Bennett, DAD of the WMDD.  Schwein stated he subsequently
sent an e-mail to Bennett, but never received a reply from
her.  He added he never had a conversation with Bennett
regarding Gritz.  Schwein stated nobody ever shared any
information regarding Gritz's mental health with him,
except her.  Ex. 10.

Schwein explained that during his TDY, he frequently
spoke with Petrowski concerning his section.  He recalled
that during a conversation, he asked Petrowski about Gritz.
He stated Petrowski indicated that Gritz had not attended a
7:15 a.m. meeting since he departed for Minneapolis.
Schwein stated he asked Petrowski to obtain Gritz's

EXHIBIT B

SECRET

building access records, so he could see the times that she
reported to work.  He explained that he intended to use
these records to formally counsel Gritz upon his return
from Minneapolis.  Schwein recalled that around the same
time period, he noticed there were other problems with
Gritz's time and attendance.  For example, he stated that
Gritz attended a one-day conference in Virginia Beach.  He
stated that Gritz claimed Monday and Thursday as travel
days, although the conference was approximately 150 miles
away.  He said she documented 10 hours worked for the two
days she was in Virginia Beach, in addition to claiming 10
hours of compensatory time for travel for each travel day,
which he stated he ultimately denied.  Schwein stated he
learned that Petrowski confronted Gritz regarding this
particular trip in his capacity as Acting SC.  He stated he
subsequently received an e-mail from Gritz indicating that
she felt she was being micromanaged by Petrowski and not
being supported.  Schwein stated he spoke with Gritz on the
phone and reiterated to her that she must address her time
and attendance issues, and that he expected her to attend
the 7:15 a.m. meetings.  He stated that despite this very
specific telephonic instruction, Gritz failed to attend the
7:15 a.m. meeting during the ensuing two duty days.  Exs.
10, 20, 22.

SECRET

EXHIBIT B

Schwein recalled that during roughly this same time period, he became aware of an e-mail that Gritz had sent to Burnham and others in Burnham's chain-of-command via the LinkedIn website.  He stated Gritz sent this e-mail after he previously instructed her to leave Burnham and his fiancé alone.  Schwein stated the e-mail was subsequently forwarded to Dave Franco, UC, CTD.  He explained that based on the content of the e-mail, Franco became concerned for Gritz's mental and emotional well being and called EAP to seek assistance for her.  Schwein stated it was his understanding that EAP advised Franco that Gritz's chain-of-command would need to be involved, and subsequently forwarded the e-mail to him.  Schwein stated that based on a review of the e-mail, the content of which was inappropriate and unprofessional, he felt he needed to do an EAP Managerial Referral Letter.  He explained he was concerned that Gritz was not effectively dealing with the emotional issues she had discussed with him, and that it was impacting her ability to remain effective in a critically sensitive interagency position.  Ex. 10.

Schwein advised that Burnham and others who were copied on Gritz's e-mail routinely deal directly with high-level officials in the U.S. Government, including FBI EM. He stated he believed the incident should be referred to

20

EXHIBIT B

SE RET

OPR for unprofessional conduct, as this type of e-mail and behavior is an embarrassment to the FBI.  He added that he was concerned that Gritz's workplace behavior was not consistent with what is expected of a senior FBI supervisor at the GS-15 grade level, and that her actions could potentially harm important interagency relationships.  He stated he discussed the incident with McCabe and Ley, and recommended that the matter be referred to OPR for further investigation.  Schwein stated McCabe and Ley agreed that the matter should be referred to OPR.  Exs. 10, 27.

Schwein stated he conducted an initial review of the building access records for Gritz, which indicated significant discrepancies when compared to her time and attendance records.  He stated that the records also indicated that Gritz could have only gone to the 7:15 a.m. meeting on two occasions, which was in direct defiance of his request for her to attend the meetings.  Ex. 10.

Schwein stated he submitted a referral to OPR concerning potential employee misconduct on or about June 20, 2012.  Ex. 27.  He stated that on the same day, he also completed and submitted an EAP Managerial Referral Letter. Ex. 28.  He stated he presented the EAP Managerial Referral Letter to Gritz during a SVTC attended by himself, Petrowski, Gritz, and Rogers.  He stated he read the

21

EXHIBIT B

SE RET

SECRET

referral and a letter defining his expectations going
forward. He stated that following the SVTC, Gritz was
allowed to meet alone with Rogers. Exs. 10, 27, 28, 29.

Schwein advised that after reviewing the information
contained in the OPR referral pertaining to Gritz's
behavior, McCabe and Ley made the decision to remove Gritz
from her position at the CIA/CTC immediately. He stated
Gritz was reassigned from his section prior to his return
from Minneapolis. He stated Gritz is still at the same pay
grade and is still assigned to the same Branch within CTD.
He stated Gritz was not singled out based on her sex, age,
disability (mental), participation in the EEO process, or
any other protected basis. He stated the decisions he made
regarding this matter were solely performance-based and
were well within his purview and responsibility as a senior
leader in the FBI. Ex. 10.

**Thomas D. Petrowski** (Sex: male; DOB:        (S)        1958;
no disability claimed), Acting SC, Special Detailee
Section, CTD, advised that he has been in his current
position since October 2012. Ex. 11. Petrowski advised
that based on personal observation and conversations he has
had with Gritz, as well as his knowledge of Gritz's
seniority in the FBI, he perceives Gritz to be a female,
approximately in her early to mid-forties. He stated he

SECRET

EXHIBIT B

SECRET

does not perceive Gritz to have a disability (mental). He
stated Gritz never indicated to him that she had a
disability of any kind. Petrowski stated he first became
aware of Gritz's participation in EEO activity when he was
contacted by an EEO Counselor sometime in late July or
early August 2012. Ex. 11.

Petrowski stated he reported to the CIA/CTC as a GS-15
Senior Detailee in January 2012. He stated Gritz reported
to the CIA/CTC a few weeks later. Petrowski stated he
became aware within weeks of Gritz reporting to the
CIA/CTC, that she was not a good fit for the position. He
explained that Gritz said inappropriate things, which
alienated her from her co-workers and the FBI's partners in
the intelligence community. He recalled an instance when
Gritz and members of her unit traveled to (A)

(S) (A)

He recalled that on the second day of the meeting,
Gritz contacted him and advised him that upon realizing
that the other individuals attending the meeting had
"ditched her," she "went for a run on the beach, went
shopping, and then kicked back and had a beer." He stated
he was later informed by members of FBI San Diego that
Gritz was excluded from the meetings because of her
unprofessional and inappropriate conduct. Ex. 11.

23

SECRET

EXHIBIT B

SECRET

Petrowski stated Gritz showed incredibly poor judgment
and poorly represented the FBI.  For example, he stated
that during executive meetings, while others discussed
operations or source matters, Gritz talked about a road
race or her dog or some other personal matter.  He stated
this was completely inappropriate and distracting.
Petrowski also stated Gritz's work ethic left a lot to be
desired.  He stated Gritz was consistently late to work,
frequently missed worked on Mondays, and was frequently
absent from critical meetings.  He stated Schwein initially
tried to mentor Gritz, and allowed her significant leeway
in missing the meetings due to her long commute and other
personal issues.  Petrowski stated Gritz always had an
excuse for not making the meetings and/or being late to
work, such as she was sick or got caught in traffic, or
something was wrong with her dogs.  He stated he had
numerous conversations with Gritz as a peer about how she
could get to the 7:15 a.m. meeting and tried to convey to
her how conspicuous her absence was.  Ex. 11.

Petrowski stated Gritz was often unprofessional in her
verbal and written communications.  He recalled that on
Gritz's first day in CIA/CTC, she told him about her
perceived personal relationship with Burnham.  Petrowski
stated that after days of Gritz's incessant speaking about

24

EXHIBIT B

Burnham, he requested that she stop talking about Burnham and her personal life, and to just talk about business. Petrowski stated he explained to Gritz that it was not appropriate in an environment such as CIA/CTC, a highly professional and structured multi-agency work environment, for her to discuss such personal matters.  Ex. 11.

Petrowski advised that when Gritz started to work in CIA/CTC, she frequently sent e-mails to him at night and/or on weekends that were not work-related and not necessary. He stated he asked her to stop sending e-mails to him at inappropriate times and about inconsequential things.  He added that other FBI employees commented to him that Gritz regularly sent late night e-mails to them that were distracting or inappropriate.  Ex. 11.

Petrowski recalled that in May 2012, he was designated Acting SC of the Detailee Section for 60 days while Schwein was on a TDY to the MP Division.  He stated that prior to departing for the TDY, Schwein wrote and signed Gritz's PSA on May 7, 2012.  Ex. 21.  Petrowski stated he left Gritz's PSA for her on Schwein's desk, and was not present when she signed it.  He stated that Gritz later commented favorably about what Schwein had written, and indicated that it was better than she had thought it would be.  Exs. 11, 21.

EXHIBIT B

SE RET

Petrowski recalled he received a call from Franco in early May 2012.  He stated Franco indicated that Gritz had forwarded an inappropriate e-mail to him that she had previously sent to Burnham on LinkedIn.  Petrowski stated Franco indicated that Gritz had also sent this e-mail to Burnham's supervisor and other high level officials in his chain-of-command.  Petrowski stated that due to the nature of the e-mail, Franco became concerned about Gritz's mental well being and contacted EAP in an effort to get her some assistance.  Ex. 11.

Petrowski advised that during the 60 days he served as the Acting SC, Gritz's attendance issues continued to be a problem.  He stated that as soon as Schwein departed for his TDY, Gritz completely stopped coming to the 7:15 a.m. pre-brief meeting.  Petrowski stated there were also other issues involving Gritz and her work, such as unnecessary travel.  For example, he stated that in early to mid June 2012, Gritz travelled to Virginia Beach to attend a conference, without his prior approval.  He stated that the following Monday after the conference, there was a work issue which required FBI coordination.  He stated he received calls from the (A) at approximately 11:15 a.m. for assistance because Gritz had still not arrived at work. Ex. 11.

(S)

SE RET

EXHIBIT B

SECRET

Petrowski stated he met with Gritz on June 12, 2012, and confronted her about her traveling to Virginia Beach for a conference without approval. He stated Gritz giggled at the accusation, and said she had a great time. He stated he told Gritz to keep in mind how this looked to her subordinates, and reminded her of the expectation that all GS-15's were to attend the 7:15 a.m. pre-brief meetings. Petrowski stated he memorialized the details of his conversation with Gritz in an e-mail dated June 13, 2012, to Schwein. Ex. 24. He stated he received an e-mail from Schwein the following day, requesting that he run Gritz's time and attendance. Ex. 25. He stated he forwarded the results of his records search to Schwein later the same day. He added that by EC dated June 20, 2012, Schwein referred the matter to OPR and the Security Division. Ex. 27. He stated he was interviewed during the internal investigation, and provided a signed sworn statement. Ex. 11.

Petrowski stated that sometime after Schwein referred the matter to OPR, but prior to Gritz being apprised of the initiation of the internal investigation, Schwein made the suggestion that they try to get Gritz into the EAP in order to give her an opportunity to address any emotional, medical or personal issues which resulted in her chronic

SECRET

EXHIBIT B

SECRET

tardiness and absenteeism, and declining work-performance.
He stated he requested that Rogers be present when he met
with Gritz.  He added that Schwein, who was still in TDY
status at the time, attended the meeting by SVTC.
Petrowski advised that during the meeting, he provided an
EAP Management Referral Letter dated June 20, 2012, to
Gritz, which detailed the concerns that management had
relating to her work-place conduct and performance, and
chronic absenteeism.  Ex. 28.  He stated that during his
tenure as a manager in the FBI, he has never referred any
employee, with the exception of Gritz, to EAP or OPR.  Exs.
11, 28.

    Petrowski recalled that early on June 26, 2012, a UC
assigned to CTD approached him and indicated that Gritz was
becoming a significant nuisance and was "badgering"
employees in his unit for replies to a previous e-mail she
sent.  He stated that later that same morning, the Chief of
(S)          (A) approached him and was clearly upset and told him that          (S)
something had to be done about Gritz.  Petrowski stated he
(S)     later met with the Chief of (A) and the (A) Deputy Chief.          (S)
He recalled that during the meeting, the Chief of (A) and
(S)     (A) Deputy Chief indicated that Gritz's habitual absence,
coupled with her unprofessional conduct when present, was a
constant distraction, and that she contributed virtually

28

EXHIBIT B

SECRET

SECRET

(S)

nothing to (A) and strongly recommended that she be
removed from her position at CIAHQ as soon as possible.
Petrowski stated that subsequent to the meeting, he sent an
e-mail to Ley and Schwein and provided details of what had (S)
been discussed during the meeting with the (A) Chief and
(S) the (A) Deputy Chief.  Ex. 30.  He stated that shortly
thereafter, McCabe made the decision to immediately remove
Gritz from her position in the CIA/CTC and reassign her to
LX-1.  Exs. 11, 30.

**Gary Douglas Perdue** (Sex: male; DOB:    (S)    1969;
no disability claimed) SAC, Pittsburgh Division, stated he
has been in his current position since June 2012.  Ex. 12.
Perdue advised that based on his personal observation, he
perceives Gritz to be a female, approximately 35 to 40
years of age.  He stated he did not perceive Gritz to have
a disability (mental).  He stated Gritz never indicated to
him that she had a disability of any kind.  Perdue stated
he first became aware of Gritz's participation in EEO
activity when he was contacted by an EEO Counselor on or
about August 27, 2012.  Ex. 12.

Perdue advised that he and Gritz previously worked
together in the WMDD.  He stated that he and Gritz also
share two common acquaintances, including Burnham.  He
stated that during the time that he was assigned to the

29

EXHIBIT B

SECRET

WMDD, Gritz was assigned as a GS-15 UC to a Strategy Unit within the WMDD. He stated he had regular interactions with Gritz and saw her on a daily basis. Perdue stated he never served as Gritz's immediate supervisor or rating official, and was never in her chain-of-command. Ex. 12.

Perdue advised that both he and Gritz, while assigned to the WMDD, reported directly to Bennett, who was then the DAD of the WMDD. He stated Bennett was Gritz's immediate supervisor and rating official. Perdue stated Gritz frequently confided in him about professional matters. For example, he stated Gritz confided in him that she was having problems with Bennett, and that Bennett would not support her in getting an Assistant Special Agent in Charge (ASAC) position. Perdue stated he tried to help Gritz and to mentor her. He stated Gritz also confided in him about personal matters. He stated, for example, that Gritz shared with him that her parents resided in the area, and that she had a dog. He stated Gritz shared with him more personal information than he needed to know, such as she was having a difficult time getting over a personal relationship. Ex. 12.

Perdue recalled that at one point, one of Gritz's subordinates approached him and was concerned that Gritz would hurt herself. He stated that sometime shortly after,

30

EXHIBIT B

he approached Bennett and advised her of the matter. Perdue stated Bennett told him to mind his own business and to be concerned about his own employees. He stated he had no knowledge as to whether or not Bennett ever addressed these concerns with Gritz. He stated Bennett never shared with him anything regarding Gritz's mental health. Ex. 12.

Perdue recalled that approximately two months after Gritz was selected for the Senior Detailee position, he received a telephone call from Schwein. Perdue recalled that during the conversation, he asked Schwein, who he stated is a friend of his, how Gritz was doing. He stated Schwein replied that Gritz was having problems with absenteeism, and asked for his input. Perdue stated he advised Schwein that Gritz had experienced similar problems while she was assigned to the WMDD. He stated he also informed Schwein that one time an employee came to him and expressed concerns that Gritz could possibly hurt herself. Ex. 12.

Perdue stated that a period of time after his telephone conversation with Schwein, he received another telephone call from Schwein in April or May 2012. He recalled that at that time, Schwein was serving as the Acting SAC of the MP Division. Perdue stated Schwein indicated that there were some issues relating to Gritz,

EXHIBIT B

and asked for formal input from the WMDD.  Perdue stated
Schwein also indicated that he may have to take formal
action, and alluded to an EAP Management Referral Letter, a
PIP, and a LOR.  He stated Schwein was critical of him for
not calling him at the time that Gritz had applied for the
position in his section.  Perdue stated he explained to
Schwein that Gritz had never been under his direct
supervision.  He stated he also told Schwein that he did
not want to prejudice him in any way regarding Gritz during
the selection process.  Perdue stated Schwein asked him if
the WMDD had any documented work-related information
regarding Gritz that would be pertinent.  Perdue stated he
made the suggestion that Schwein discuss the matter with
Bennett.  He stated he was not certain if Schwein ever
spoke with Bennett.  Perdue stated he did not share
confidential information regarding Gritz's mental health.
He stated he was aware of Gritz's emotional problems, but
did not have any information regarding Gritz's mental
health disabilities.  Ex. 12.

   **Jennifer E. Ley,** (Sex: female; DOB: ▮(S)▮ 1979;
no disability claimed) DAD, Operations Branch III, CTD,
stated she has been in her current position since June
2012.  Ex. 13.  Ley advised that based on her personal
observation, she perceives Gritz to be a female,

32

SECRET

EXHIBIT B

approximately in her mid-forties. She stated she did not
perceive Gritz to have a disability (mental). She stated
Gritz never claimed or indicated to her that she had a
disability of any kind. Ley stated she first became aware
of Gritz's participation in EEO activity when she received
notification from the OEEOA the week of January 7, 2013.
Ex. 13.

   Ley stated that both she and McCabe were aware of the
allegations raised by Schwein relevant to inconsistencies
in Gritz's time and attendance statements, a pattern of
chronic tardiness and frequent absenteeism,
insubordination, and unprofessional and inappropriate e-
mails. She recalled that on or about June 20, 2012,
Schwein submitted an EC and recommended that the matter be
referred to OPR for further investigation. Ex. 27. Ley
stated that based on a review of the EC and the supporting
documents, including time and attendance records that were
inconsistent with Gritz's entry and exit times from the
building, she concurred with Schwein's recommendation to
refer the matter to OPR. She added that she would be
negligent in her responsibilities and duties as a manager
if she did not report the matter. Ley stated the decision
to refer the matter to OPR had nothing to do with Gritz's
sex, age, disability (mental), or participation in the EEO

33

EXHIBIT B

SECRET

process.   Ley stated she has never previously referred an
employee to OPR.   Ex. 13.

Ley recalled that on or about July 3, 2012, she met
with Gritz in her office, located at LX-1.   She recalled
that Schwein was on a TDY at that time and was not
available to attend the meeting.   Ley stated that at the
outset of the meeting, she advised Gritz that a decision
had been made by McCabe to remove her from her position as
Senior Detailee for performance-related issues.   She stated
Gritz was aware of, and admitted to, the e-mail she had
sent via "Linked In" which had caused tension with the
FBI's partners at the CIA, including several senior
managers.   Ex. 27.   Ley stated Gritz was clearly
disappointed, but remained agreeable and at one point,
became emotional.   Ley stated it was her impression that
Gritz was also embarrassed.   She stated that during the
meeting, Gritz shared with her that she was having
emotional issues as a result of coping with a divorce.   Ley
stated she conveyed to Gritz that being reassigned would
benefit her, and Gritz agreed.   She stated the decision to
remove Gritz from her position was entirely performance-
based and had nothing to do with her sex, age, disability
(mental), or her participation in the EEO process.   Exs.
13, 27.

34

SECRET

EXHIBIT B

SECRET

Ley recalled that the following week, on or around Monday, July 9, 2012, Gritz approached her in her office. Ley stated Gritz indicated that she had spoken with her father about her removal over the weekend, and had come to the conclusion that her leaving the Senior Detailee position was probably the best thing for her. Ley stated that Gritz then thanked her. Ex. 13.

Ley advised that Gritz was reassigned to a different section in the same Branch, Operations Branch III, within CTD, housed within the LX-1 facility. She stated Gritz was assigned to work with a GS-15 Assistant Section Chief and assigned work commensurate with her experience and pay grade. Ley stated Gritz's pay grade to this day remains the same. Ley added that during her tenure as a manager in the FBI, she recommended the removal of one other employee, a GS-15 IA, from his position due to performance-related issues. She stated the employee was not demoted, but was reassigned to another section within the Directorate of Intelligence, the Division she was assigned to at the time. Ex. 13.

**Andrew G. McCabe** (Sex: male; DOB: [（S）] 1969; no disability claimed) Assistant Director (AD), CTD, stated he has been in his current position since May 2012. Ex. 14. McCabe stated he has known Gritz in a professional capacity

35

SECRET

EXHIBIT B

for many years. He stated he perceived Gritz to be a
female in her forties. He added he did not know Gritz's
birth date, but assumed she was approximately the same age
as him. McCabe stated Gritz never shared any information
with him indicating she has a disability of any kind. He
added that Gritz never submitted a request, verbally or in
writing, to him for a reasonable accommodation based on a
disability. He stated he first officially became aware of
Gritz's participation in EEO activity when he received an
EC dated October 25, 2012, from the OEEOA. He stated he
later received an e-mail from an EEO Investigator on
February 14, 2013. Ex. 14.

McCabe stated he received an e-mail on his BlackBerry
from Gritz on Saturday, June 16, 2012, seeking his support
in some kind of conflict that she had with her supervisor.
Ex. 26. He stated he thought it was odd and inappropriate
that Gritz reached out to him directly on a Saturday
afternoon, without properly using her chain-of-command. He
stated he had no prior knowledge or notification of the
matter and therefore, did not fully understand the
background or circumstances of the issues raised in the e-
mail. He stated he immediately replied to Gritz's e-mail,
and informed her that he could not possibly comment on any
performance issues that she may or may not have had in her

36

EXHIBIT B

position as a Senior Detailee. McCabe stated he explained to Gritz that the day to day performance of all of his detailees was well beyond his scope, necessitating the need to use one's chain-of-command. He stated he advised Gritz to raise her concerns to her SC or to Ley. Ex. 14.

McCabe stated that on June 19, 2012, while he was in New York on personal matters, he received a call from Ley regarding Gritz. He stated Ley indicated that there was a controversy between Gritz and another intelligence community officer who was connected to the CIA/CTC. He stated Ley explained that Gritz had sent inappropriate e-mails about this person via an open source social network, which caused controversy, and concern among our partners at the CIA, to include high level officials. Ex. 27. McCabe stated Ley also advised him that Schwein had supervisory issues with Gritz. He stated that according to Schwein, Gritz was frequently not available at work, and failed to follow his direct instructions, to include attending important meetings. He stated Ley also told him that Schwein pulled a sampling from the CIA system that indicated the times and dates that Gritz used her Intelligence Community (IC) badge to enter and exit CIAHQ and LX-1. Ex. 27. McCabe stated the records indicated

SECRET

that her times were not consistent with her FBI time and attendance records.   Ex. 14.

McCabe explained that as the AD of CTD, he is ultimately responsible for the FBI's relations with the CIA on all counterterrorism matters.  He stated he was very concerned that Gritz's conduct and performance were having a negative impact on the FBI's relationship with the CIA. He stated he made three recommendations to Ley.  He stated he requested that Ley and Schwein talk with Gritz and make her aware of the services that are available through EAP and her access to EAP.  He stated he requested that Schwein compose an EC to OPR and provide details of Gritz's time and attendance inaccuracies; her failing to attend critically important meetings despite being repeatedly told to do so by her immediate supervisor; and her unprofessional and inappropriate e-mails.  He stated he also requested that Ley temporarily reassign Gritz to LX-1, where she could be more closely monitored, until the OPR matter was resolved.  McCabe stated that later, in follow up conversations with Ley, he learned that officials at CIA had previously asked that Gritz be removed from her detailee position.  Exs. 14, 27.

SECRET

EXHIBIT B

SECRET

McCabe stated that Ley personally met with Gritz and informed her of her reassignment. He stated arrangements were made to have Gritz reassigned to another section within Operations Branch III of CTD. He stated Gritz currently reports to an Assistant SC and is assigned work, such as special projects, that are commensurate with her skill set and pay grade. He pointed out that Gritz's pay grade remained the same, and she was not reduced in pay or position. Ex. 14.

McCabe stated his decision to remove Gritz from her Senior Detailee position and reassign her had nothing to do with her sex, age, disability (mental), or her participation in the EEO process. He stated he routinely reassigns employees within his Division in order to remove them from unproductive and/or negative situations with the goal of providing them with a new opportunity and a fresh start. He added that he very recently reassigned another employee, David McAlpine, who was also serving in a liaison position at a CIA facility, as a result of his referral to OPR. McCabe stated he reassigned McAlpine to FBIHQ until the OPR investigation is resolved. Ex. 14.

39

EXHIBIT B