## THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| ROBYN L. GRITZ, | **:** | Case No. 1:18-cv-02712-KBJ |
| Plaintiff | **:** | |
| | | July 14, 2019 |
| vs. | **:** | |
| FEDERAL BUREAU OF INVESTIGATION, | **:** | JURY TRIAL DEMANDED |
| Defendant. | **:** | |

### AMENDED COMPLAINT AND JURY DEMAND

COMES NOW PLAINTIFF, Robyn L. Gritz, by and through undersigned counsel, and files this First Amended Complaint, sues the Defendant, and as cause, states:

### NATURE OF THE CASE

1. This action seeks declaratory, injunctive, and equitable relief, monetary and liquidated damages, and costs and attorney fees to remedy the unlawful age, gender, and disability discrimination Robyn L. Gritz, by the Federal Bureau of Investigation ("FBI") and subsequent retaliation by the FBI when she objected to the above-mentioned discrimination.

2. This action also seeks declaratory, injunctive, and equitable relief, monetary and compensatory damages, and costs and attorney fees for the retaliation suffered by Plaintiff when Plaintiff's former supervisors, Andrew McCabe and Rick Schwein, among others, subjected Plaintiff to an openly hostile work environment. The hostility stemmed from Plaintiff's participation in protected activity under the provisions of the ADEA, Title VII of the Civil Rights Act of 1964, and the Rehabilitation Act of 1973, as

amended, Title 29 U.S.C. §§ 791 and 794, on account of her opposition to the gender, disability, and age discrimination to which she had been previously subjected.

## **JURISDICTION**

3. This action arises under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e, *et seq.*, and the Civil Rights Act of 1991, 42 U.S.C. § 1981a; The Age Discrimination in Employment Act, Title 29 U.S.C. §621 *et seq.*; and the Rehabilitation Act, Title 29 U.S.C. §§ 791 and 794.

4. Jurisdiction is invoked pursuant to Title 23 U.S.C. §1343(a)(3), Title 28 U.S.C. §1343(a)(4), Title 29 U.S.C. §626(b) and Title 42 U.S.C. §2000e-5(f).

5. All conditions precedent to jurisdiction under Section 706 of Title VII of the Civil Rights Act of 1964, Title 42 U.S.C. §2000e-5(f)(3), and the ADEA have occurred or have been complied with in the following manner.

6. On June 15, 2012, Plaintiff, a Supervisory Special Agent (SSA), Counterterrorism Division (CTD), of the FBI, made contact and filed an informal complaint of discrimination and retaliation with the Office of Equal Employment Opportunity Affairs, within the FBI,  alleging that she was discriminated against and subjected to unlawful retaliation based on her age, physical disability, and sex.

7. On August 14, 2012, Plaintiff filed a formal complaint with the Equal Employment Opportunity Commission (EEOC), pursuant to the FBI's Office of Equal Employment Opportunity Affairs' determination that the discrimination and subjected to unlawful retaliation based on her age, physical disability, and sex. This was after the FBI failed to resolve the complaint informally.

8.  Declaratory, injunctive, monetary, compensatory and liquidated damages and equitable relief is sought pursuant to Title 28 U.S.C. § 2201, §2202, Title 29 U.S.C. § 626 and Title 42 U.S.C. 2000e-5(g)

9.  Compensatory damages are sought pursuant to Title 42 U.S.C. §1981a.

10. Costs and attorney fees may be awarded pursuant to Title 42 U.S.C. §2000e-5(k), Title 29 U.S.C. §626 and Title 42 U.S.C. §1988.

## VENUE

11. This action properly lies in the United States District Court for the District of Columbia pursuant to Title 28 U.S.C. §1391(b), because the claims of Plaintiff arose within this judicial district.

12. This action also properly lies in the United States District Court for the District of Columbia pursuant to Title 29 U.S.C. §626, because the unlawful employment practices were committed in this judicial district.

## PARTIES

13. Plaintiff, Robyn L. Gritz ("Plaintiff"), a female, born January 21, 1969, is a citizen of the United States residing in the State of Illinois.

14. The defendant, Matthew Whitaker, was the Acting Attorney General of the United States of America and was considered the head of the Department of Justice, which oversees the Federal Bureau of Investigation ("FBI").

15. Mr. Whitaker was being sued in his official capacity pursuant to Title 42 U.S.C. §2000e-16(a).  Mr. William Barr has since succeeded Mr. Whitaker as the  U.S. Attorney General.

16. The United States Department of Justice, and the FBI, of which Whitaker was the head, are executive agencies within the meaning of 42 U.S.C. §2000e-16(a).  As this Amended Complaint is submitted for filing, William Barr is U.S. Attorney General and Christopher Wray directs the FBI.

## FACTS

*Plaintiff's FBI Career Before the Joint Duty Detailee Position (1997- Jan 11, 2012)*

17. In 1997, Plaintiff applied to and was offered employment with the FBI.

18. On or about July 20, 1997, Plaintiff entered on duty as a Special Agent (SA) with the FBI.

19. Upon completion of new agent's training at the FBI Academy, Plaintiff was assigned to the Newark Division.

20. Between July 20, 1997, and October of 2004, Plaintiff worked in capacities such as the relief supervisor on a Joint Terrorism Task Force (JTTF) and worked on cases such as the 9/11/2001 terrorist attacks, the Daniel Pearl abduction and murder, the 2002 church bombing in Pakistan, the 2001 Anthrax attacks within the US, investigation of the Holyland Foundation, and numerous other international and domestic terrorism events.

21. In October of 2004, Plaintiff was promoted to Supervisory Special Agent (SSA) at FBI Headquarters (FBI HQ) in the Counterterrorism Division (CTD) International Operations Section One (ITOS I).

22. In this capacity plaintiff was commended by then Generals Stanley McChrystal, Michael Flynn, and Keith Alexander for her leadership in an operation, termed groundbreaking by DOJ executive management, providing real-time threat information from Iraq and Afghanistan.

23. Plaintiff and her team received the Office of Directorate of National Intelligence (ODNI) Meritorious Unit Citation for this operation.

24. Plaintiff has been awarded three of these awards while working in CTD for separate investigations.

25. Plaintiff also worked extensively on critical investigations with interagency partners, as well as, foreign partners.

26. In October of 2006, Plaintiff was promoted to Assistant Inspector, Inspection Division.

27. In November of 2007, Plaintiff was requested to return to the CTD by James McJunkin, then the CTD Assistant Director, due to an issue with a major field office that required a seasoned SSA to handle.

28. Upon her return to the CTD, and Plaintiff was selected above at least 26 other candidates, to become the Supervisory Special Agent (SSA), CT Extraterritorial Squad (CT-2) in the Washington DC Field Office. This is a coveted squad assignment due to responsibility and participation in overseas operations, significant high-profile assignments, and

extensive liaison within the United States Government (USG) interagency partners as well as with foreign partners.

29. Investigations Plaintiff led at the Washington DC Field Office included: the Blackwater shooting in Nisur Square-Iraq, the Robert Levinson-retired FBI Agent held hostage in Iran, the Chuckie Taylor torture and war crimes prosecution in Liberia, the assassination of Benazir Bhutto in Pakistan, and the attacks on the US Embassies in Beirut, Lebanon and Sanaa, Yemen.

30. In this capacity, Plaintiff served on the National Security Staff's Hostage and Personnel Working Group, which reported to the National Security Advisor to the President.

31. Numerous Americans were brought out of captivity with direct involvement by Plaintiff.

32. In December 2009, Plaintiff was promoted to GS-15 Unit Chief of the Executive Strategy Unit, Weapons of Mass Destruction Directorate (WMDD) .

33. Plaintiff served as the Acting Assistant Director on several occasions, to include having duties usually done by an Assistant Director delegated to Plaintiff, and was the Acting Assistant Director on September 11, 2010.

34. From September to December of 2010, Plaintiff was selected as the FBI's and USG's representative to attend a prestigious four-month course at the George C. Marshall Center in Garmisch, Germany, for the Executive Program in Advanced Security Studies, as one of the 141 participants from 43 countries. The program is a United States Department of Defense and Germany's Federal Ministry of Defense security and defense studies institute.

*Plaintiff Operating as Joint Duty Detailee (Jan 11, 2012 - July 3, 2012)*

35. From January 11 to July 5, 2012 plaintiff was assigned as Senior Liaison Officer, a designated Joint Duty Detailee, to the Central Intelligence Agency's Counterterrorism Center (CTC) in the Yemen/Somalia Department (YSD).

36. On or about June 15, 2012, Plaintiff had an informal meeting with an FBI Equal Employment Opportunity (EEO) counselor, Regina Fields, regarding ongoing discrimination by SC Richard D. Schwein and A/SC Petrowski.

37. During the days leading up to the informal EEO meeting meeting, Plaintiff had contacted at least 5 EEO counselors to set up an appointment to file a complaint. Only one EEO counselor responded to assist Plaintiff in setting up an appointment.

38. Plaintiff's EEO appointment date was changed multiple times before Plaintiff eventually met with EEO counselor Regina Fields.

39. EEO counselor Regina Fields did not inform the Plaintiff that each future incident of discrimination or retaliation by Petrowski or Schwein would require a separate formal EEO complaint.

40. Following the informal meeting, the counselor's report mischaracterized the contents of the meeting.  The counselor's synopsis stated that she had offered ADR/mediation, but in the meeting, Fields had told Plaintiff that she was not eligible for ADR because she was under ODR.

41. Thomas Petrowski, in this case, was selected along with Plaintiff as Senior Liaison Officers, Joint Duty Detailees, to the CIA Counterterrorism Center.

42. Petrowski and Plaintiff started on the same day in January 2012.

43. Petrowski had come from the Dallas Division of the FBI and was on an 18-month temporary duty assignment.

44. From May to July 2012, Schwein was sent to the Minneapolis FBI Division. Schwein selected Petrowski as the Acting Senior Executive Service over the detailees in Schwein's absence.

45. A memo written by Schwein, dated March 9, 2012, detailed his reason for selecting Petrowski to be the Acting Deputy Director for Law Enforcement, CIA Counterterrorism Center, in his absence.

46. In the memo dated March 9, 2012, Schwein's reason for the selection of Petrowski specifically states he "is an experienced GS-15 who has the requisite background and experience to serve in this position. SSA Petrowski is the most qualified individual in the Section to take on this responsibility."

47. Following Schwein's assignment to Minneapolis, he submitted Petrowski for an incentive award, dated August 8, 2012, for being the Acting Senior Executive Service and included the following statements, "SSA Petrowski dealt with a contentious personnel issue and remained professional in his dealings with the problematic employee.

His meticulous detailing of the issues led to the referral of this employee to OPR for possible employee mis-conduct."

48. Petrowski stated in his initial interview with the FBI EEOC counselor that he had nothing to do with the referral of Plaintiff to Office of Professional Responsibility.

49. In a June 13, 2012, email from ASC Petrowski to SC Schwein, Petrowski accuses Plaintiff of "sneaking away" to attend a "USN sponsored conference" at Virginia Beach without approval despite the fact Plaintiff had notified Petrowski of her intent to attend the conference the week prior. Additionally, his characterization of the conference was incorrect. In actuality, the conference was an interagency conference for individuals working Yemen and Somalia.

50. Petrowski stated that Plaintiff attended a Virginia Beach conference to "meet Navy SEALs", when in fact Plaintiff was tasked to attend the Yemen and Somalia conference by the Deputy Chief (DC) of the department she was detailed to as one of their representatives.

51. Petrowski stated that Plaintiff "giggled" at the accusation that she had snuck away.

52. Plaintiff did not giggle when Petrowski accused her of sneaking away to go to the conference. Plaintiff does not giggle when discussing serious matters.

53. When Plaintiff returned from the Virginia Beach meetings, Petrowski said she obviously didn't know her responsibilities as a detailee. Plaintiff asked Petrowski to explain her responsibilities.

54. In response, Petrowski stood up, got in Plaintiff's face waving his finger yelling at the top of his lungs that "you think you got one over on me." Then Petrowski stormed out of his own office.

55. During the incident in which Petrowski screamed at Plaintiff and stormed out of his own office, Plaintiff felt physically threatened by Petrowski.  Petrowski's actions were highly inappropriate and unprofessional.

56. On June 14, 2012, in a phone call between Plaintiff and SC Schwein, Plaintiff informed Schwein she did not feel she was being treated equitable with the other detailees.

57. Plaintiff asked to have the Ombudsman present at future meetings, specifically later at the June 20, 2012 VTC.

58. SC Schwein responded to Plaintiff's request by threatening he could "pull her timecards if she wanted to go that route".

59. During the phone conversation between Schwein and Plaintiff on the phone on June 14, 2012, Schwein stated he thought Plaintiff's personal life was fragile and it may be affecting her job, and that maybe the detailee position wasn't the right job for Plaintiff.

60. On another occasion, when Plaintiff was in Schwein's office, Schwein asked Plaintiff: "at this time in your life, wouldn't you rather take a less stressful job in a Resident Agency office?"

61. Plaintiff told Schwein she was not fragile, and thanked him for his misguided concern.

62. On February 7, 2012, Gary Douglas Perdue had spoken with Richard Schwein regarding Plaintiff.

63. Schwein reported that Perdue was made aware by an Employee Assistance Program (EAP) counselor that there was a concern Plaintiff was going to "hurt herself".

64. When Plaintiff became aware of this conversation, Plaintiff personally spoke with EAP coordinator Wendy Nickel, who was cited in Perdue's statement as the person who shared protected information.

65. Nickel strongly denied the allegation and informed Plaintiff that Perdue was always asking Nickel about Plaintiff and trying to acquire personal information regarding Plaintiff when she worked in WMDD.

66. To reiterate, Perdue was never in Plaintiff's chain of command.

67. While Plaintiff was at WMDD, Perdue repeatedly undermined her and her professional responsibilities on several occasions and undermined her position on numerous occasions while he was a Section Chief (SC) in WMDD.

68. Schwein and Perdue contend that they discussed EAP "concerns" in the 2/27/12 phone call. Although acting as senior management, they did not follow EAP protocol.

69. After the discussion between Schwein and Perdue, Schwein began to regularly initiate conversations with Plaintiff about her emotional well-being, divorce, and EAP activity.

70. Schwein continued these advice sessions regarding well-being, even commenting that taking Vitamin D helped with his mood.

71. On June 14, 2012, SC Schwein emailed SC Petrowski regarding referring Plaintiff to OPR for time and attendance fraud. Schwein wrote "What do you think about a referral to OPR for T&A fraud. Is there enough here to make that case?".

72. ASC Petrowski replied to SC Schwein's email twenty minutes later, writing "Let's talk at your convenience. I have someone in OPR looking at this offline and will have a solid opinion from them today."

73. The offline OPR conducted against Plaintiff was a severe violation of FBI policy and protocol.

74. On June 15, 2012, and on June 19, 2012, Plaintiff contacted the Ombudsman to discuss options regarding the treatment she had been receiving from Schwein and Petrowski.

75. On June 20, 2012 SC Schwein and SC Petrowski filed an EAP and an OPR using similar verbiage.

-12-

76. The June 20, 2012 VTC turned out to be a management referral of Plaintiff to EAP by SC Schwein and SC Petrowski, despite the fact that Plaintiff had told Schwein a week earlier that she had contacted EAP due to stress she was under from the ongoing treatment by him and Petrowski.

77. During the EAP referral teleconference, Schwein stated he didn't think Plaintiff could handle the detailee position.

78. Plaintiff did not become aware of the OPR filing until June 31, 2012, and the facts of the OPR were not known by Plaintiff until October 2012.

79. The strategy of double-referral, both to EAP and OPR, was an attempt by Schwein and Petrowski to take a double-pronged approach at discrediting and dishonoring Plaintiff.

80. Neither Schwein nor Petrowski notified EAP of a referral to OPR. This deprived Plaintiff the opportunity to remedy any issues, if there were any.

81. On June 28, 2012, ASC Petrowski noted in an email to Schwein, "[Chief YSD] and [YSD Deputy Chief] were far more negative than I expected. We're tracking on this - we need to just keep to the plan."

82. The Yemen/Somalia Department (YSD) is the CIA division at which Plaintiff was a detailee during this period, sometimes referred to as the gaining element under ODNI policy.

83. YSD Deputy Chief was Plaintiff's direct supervisor at YSD and controlled her time and tasking. Chief YSD had delegated Plaintiff's time and tasking to YSD Deputy Chief.

84. On July 2, 2012, Plaintiff was scheduled to meet with Deputy Assistant Director (DAD) Ley to discuss issues with Schwein and Petrowski. Due to a major storm and closed buildings, DAD Ley cancelled the first meeting.

85. When Plaintiff and DAD Ley met on July 3, 2012, Ley admitted she was with Assistant Director (AD) McCabe the prior day discussing what to do with Plaintiff.

### *Plaintiff Removed As Detailee, Ongoing Retaliation (July 3-2012, Aug 14, 2012)*

86. On or about July 3, 2012, after Plaintiff's visit to the hospital on June 22, 2012, for severe chest pains, and after Plaintiff was already involved in the FBI's informal Office of Equal Employment Opportunity Affairs process, she was told she was effectively relieved of her duties at the CIA Counterterrorism Center, effective on July 5, 2012.

87. When DAD Ley pulled Plaintiff back to CTD, Ley stated that she knew Plaintiff did a good job and that AD McCabe wanted to get Plaintiff out of the situation. DAD Ley told Plaintiff that Plaintiff would be working strategic projects for the Strategic Operations Section, which turned out to be untrue.

88. Plaintiff was provided false information as to why she was removed from the detailee position, what her new position would be at CTD, and who she would report to.

89. In Plaintiff's PAR, and in other paperwork, the reason for removing Plaintiff from her detailee position was stated as "not being a good fit", being incompetent, and other negative notations.

90. Plaintiff was provided false information regarding what her new position at CTD would be when Ley said she wanted to use Plaintiff's strategy skills on strategic projects.

91. Plaintiff was provided false information regarding who she would report to when Ley told Plaintiff she would report to Thomas Van Nuys.

92. Also, on July 3, 2012, Plaintiff notified DAD Ley that she had secured a position at Quantico to teach should CTD release her to the Counterintelligence Division.  DAD Ley did not entertain this option of a direct placement of Plaintiff to Quantico.

93. Instead, Plaintiff was involuntarily transferred to LX-1, which Plaintiff had previously informed DAD Ley required over an hour commute.

94. In the strictly administrative unit to which Plaintiff was assigned, she was the only special agent and was supervised by a GS-15 Support (non-Agent) Unit Chief, a position Plaintiff had previously held in her career.

95. Plaintiff also was the only employee in the unit who had the AVP time and attendance requirement which left Plaintiff sitting alone in the unit, without assignments, for an extra two hours daily.

96. In her new position, Plaintiff was required to attend the morning Unit Chief meeting despite her comments and experience being disregarded because Plaintiff did not have a unit.

97. In her new position, SC Marylou Felder informed Plaintiff she was not considered a Unit
Chief when Plaintiff questioned the placement of a GS-14 as the acting UC over Plaintiff,
already named within the FBI as a UC. This occurred in the second Unit which Plaintiff
was assigned to in CTD, after Plaintiff had complained of being idled and retaliated
against.

98. After Plaintiff was removed as a detailee, CTD took special measures to try to maintain
the appearance of not demoting Plaintiff from her GS-15 grade, however Plaintiff was
simultaneously subjected to menial work and a hostile, retaliatory, and discriminatory
environment.

99. During early July 2012, Plaintiff requested that DAD Ley inform Schwein not to fill out
the management portion of her 360 for an upcoming Leadership Development Seminar
because of the ongoing retaliation against Plaintiff, the EEO claim involving Schwein,
and the fact that Schwein had only been Plaintiff's manager for half of the rating
period.

100.     DAD Ley ignored Plaintiff's request and allowed Schwein to fill out the 360,
which significantly negatively altered the results.

101.     Schwein included long, drawn-out berating and biased comments against Plaintiff
in the 360 report.

102.     Plaintiff had previously asked DAD Laurie Bennett, who supervised Plaintiff for
two years and who Plaintiff believed would be upfront and honest in her
comments/ratings, to fill out the manager portion of the 360 report. DAD Bennett did fill
it out with fair and accurate comments.

103.    A review of Plaintiff's 360 shows a distinct difference between how Plaintiff's peers rated and reviewed her and how Schwein rated and reviewed her.

104.    From July 5, 2012 forward, Plaintiff, a GS-15 SSA, was given mostly administrative assignments below her GS-15 level and did not retain the title of Senior Liaison Officer. Many months would go by when no assignments were given to Plaintiff.

105.    After July 5, 2012, other members of CTD were told not to write any email or letter in support of Plaintiff.

106.    Plaintiff was not invited to critical meetings for the Benghazi attack and the Boston Marathon Bombing, among other incidents, even though she had an expertise in the nature and level of those matters.

107.    On July 18, 2012, Plaintiff asked DAD Ley if Assistant Section Chief (ASC) Van Nuys was doing her Performance Appraisal Report (PAR) because Plaintiff did not want Schwein involved.

108.    Plaintiff did not want Schwein involved in her PAR because of the pending EEO complaint against him, his previous acts of reprisal against Plaintiff,  the fact that Plaintiff had worked for Schwein for not even half of the rating period of the PAR, and the fact that the OPR notification process instructed Plaintiff not to have contact with Schwein.

109.    Plaintiff informed SC Schwein to forward her performance "drop folder" to Van Nuys to conduct the PAR. Plaintiff was not corrected by DAD Ley, ASC Van Nuys, or SC Schwein.

110.     Despite Plaintiff's continued protest, Schwein eventually conducted Plaintiff's PAR.

111.     On July 19, 2012, SC Schwein stopped Plaintiff when she was exiting a conference room following a meeting at LX-1, to explain to Plaintiff why he filled out the 360 the way he did.

112.     When SC Schwein stopped Plaintiff at LX-1 on July 19, 2012, he had already filed an EAP referral and an OPR complaint against Plaintiff, but Plaintiff did not know about the OPR complaint.

113.     Schwein told Plaintiff that he felt she took things personally and was too emotional, and that this is why he believed Plaintiff to be unprofessional. Similarly gender stereotyping and biased language was written by Schwein in the 360 and the PAR.

*Plaintiff's PAR, Policy Violations, and Ongoing Retaliation*
*(August 14, 2012 -January 24, 2013)*

114.     On August 14, 2012, Plaintiff filed a formal EEOC complaint alleging the FBI subjected her to hostile work environment on the basis of her sex (female), disability (mental, perceived), age (43), and in reprisal for protected EEOC activity.

115.     Plaintiff was not informed, by anyone, of the requirement that she must file another formal complaint if she countered another instance of discrimination or retaliation.

-18-

116.     At the meeting for the informal EEO complaint, regarding the formal complaint

deadlines, Plaintiff was only counselled not to miss the filing deadline for her

complaint.

117.     To reiterate, at no time in the EEO/EEOC process was the Plaintiff counseled or

informed that each individual incident of discrimination or retaliation would require a

separate claim or that there was an administrative exhaustion requirement for each future

individual instance of retaliation or discrimination.

118.     On September 13, 2012, in an email from Plaintiff to Thomas Van Nuys, Ley

and a Unit Chief named Michelle Samsone, Plaintiff stated: "If I can get a performance

plan issued and a reporting structure, I'd appreciate it so I know what is expected of

me."

119.     On October 26, 2012, Plaintiff was told by ASC Van Nuys to come sign her PAR.

Plaintiff originally was absent and taking sick leave, but Van Nuys insisted she needed to

sign that day. Plaintiff complied and went to work.

120.     When Plaintiff arrived to the PAR presentation, SC Schwein was present.

121.     Plaintiff left the area and called ASC Van Nuys on his phone and inquired if

Schwein was present because he was participating in the presentation of her PAR. Van

Nuys replied "yes", and asked Plaintiff "was there a problem with that?" Plaintiff replied

yes because there was a pending EEO complaint and OPR matter, which Plaintiff had

presented to Van Nuys and CTD Human Resources. Van Nuys told Plaintiff, "That's the

way it is."

122.     Plaintiff had been told by HR Rep. Robinson that SC Schwein did not have to be

present at Plaintiff's PAR presentation. Rep. Robinson attempted to call Van Nuys, but

was overturned by HR UC Pamela Sommers, who was invited by the Plaintiff to sit in on the PAR presentation with Schwein present instead.

123.     UC Sommers did not object to Plaintiff being uncomfortable with Schwein involved in the PAR, despite the pending formal EEO complaint and the OPR matter.

124.     Before Plaintiff went in for the PAR presentation, Tonya Odom at the FBI's EEO office informed Plaintiff that there was nothing Plaintiff nor the EEO could do.

125.     During the PAR presentation, Plaintiff asked SC Schwein if he inquired with YSD Deputy Chief, who tasked Plaintiff and managed Plaintiff's role as detailee, as well as Plaintiff's expected time and attendance. Schwein admitted that he did not inquire with YSD Deputy Chief.

126.     Instead, Schwein had consulted with Chief YSD, despite the fact that Schwein had been made aware months prior that Chief YSD did not task Plaintiff and her direct supervisor was Deputy Chief YSD.

127.     Chief YSD was not fully aware of what Plaintiff was tasked with and had delegated her reporting to Deputy Chief YSD.

128.     Plaintiff had previously stated in an email, circa May 17, 2012, the date of the mid-year evaluation, that Deputy Chief YSD was not consulted in her mid-year evaluation and he should have been because he is her tasking manager. Plaintiff stated this to SC Petrowski and SC Schwein, as well as DAD Ley on several occasions. Plaintiff was summarily ignored.

129.     Plaintiff's PAR was not signed by the reviewer prior to being presented to Plaintiff, a violation of both FBI Human Resources Division (HRD) and Office of Personnel Management (OPM) written policy.

130.     Plaintiff's 2012 PAR was the first in Plaintiff's 16 year career where she was rated below Excellent or Outstanding. This was the first time in Plaintiff's 16 year career that she had received a negative rating. Plaintiff was rated Excellent the six years leading up to this PAR.

131.     In the PAR, Schwein states Plaintiff had poor work ethic.

132.     Retired CTD AD Michael J. Heimback stated in a 2012 email to Plaintiff, "Your work and work ethic has always been outstanding."

133.     Plaintiff has received numerous commendations throughout her career which document her consistent and outstanding work ethic.

134.     On November 9, 2012, Plaintiff filed a grievance to AD McCabe of her PAR ratings and attached an addendum within a two inch binder of classified documents justifying the grievance, tabbed by Critical Element.  Plaintiff submitted voluminous documentation and justification for at the very least a "Successful" rating.

135.     This grievance was denied by AD McCabe, citing insufficient justification to change ratings. Plaintiff received notice of this on November 21, 2012.

136.     Instead of changing the rating, McCabe "whited-out" one sentence on an official government personnel form in which Schwein refers to the OPR investigation as a justification for Plaintiff's negative ratings. The use of white-out on a PAR is against OPM written policy.

137.    In making the decision to "white-out" one sentence of the PAR, AD McCabe also neglected or failed to realize that the PAR was based upon the one-sided and incomplete OPR narrative constructed by Schwein and Petrowski as a response to Plaintiff's protected status and potential EEO claim.

138.    Schwein failed to list many of Plaintiff's accomplishments in her PAR. Instead, Schwein listed Plaintiff's accomplishments in his own PAR.

139.    Schwein obtained an Excellent or Outstanding rating on each element of his PAR from AD McCabe.

140.    On November 26, 2012, Plaintiff was made aware that AD McCabe denied her a lateral transfer to FBIHQ which would have lessened her time in the location where she was targeted and retaliated against.

141.    The lateral transfer denied by AD McCabe would have provided Plaintiff less cost and stress and would have allowed her to function at the GS-15 Unit Chief level and have duties commensurate with a GS-15.

142.    It is abnormal for a lateral transfer such as the one denied by AD McCabe to go above the SC or DAD level. AD McCabe's involvement in the denial of Plaintiff's lateral transfer was abnormal.

143.    On the following dates, Plaintiff became aware of non-selection to jobs on career boards. In each instance, AD McCabe had provided damaging information regarding Plaintiff to the career boards for jobs Plaintiff applied to: two instances on 9/25/2012, 10/18/2012, 10/23/2012, 10/24/2012, 10/25/2012, 10/26/2012, 11/01/2012, 11/06/2012, and 5/01/2013.

-22-

144.     In two of the local candidate career boards, Plaintiff was ranked #1 until AD
McCabe submitted the Division Head Comments on FD-955s. After that submission,
Plaintiff was unranked in one and ranked lower in another.

145.     Both positions would have considerably benefitted Plaintiff's stress and shortened
Plaintiff's commute significantly, as well as relieved her of the retaliatory hostile work
environment.

146.     AD McCabe's comments in the FD-955s are based on misleading and
misrepresented information derived from misinformation obtained during the OPR
investigation and the false narrative constructed by Schwein and Petrowski.

147.     On February 14, 2014, Plaintiff became aware that the FBI had told the
Commonwealth of Virginia that Plaintiff had been discharged for misconduct. This does
not match the SF-50 which Plaintiff received from the agency, which shows Plaintiff
resigned.

148.     Due to this statement by the agency, the Commonwealth of Virginia (VA)
disqualified Plaintiff from unemployment benefits.

149.     VA sent the documentation which was submitted to them by the FBI to the
Plaintiff. This libelous documentation was the full OPR adjudication letter given
previously to the Plaintiff, which included the false and misleading information already
discussed within this amended complaint.

_OPR Investigation and Policy Violations, Misinformation (January 24, 2013 - February 2013)_

150.     On January 24, 2013, Plaintiff was interviewed for the OPR investigation

Schwein and Petrowski had pursued against her beginning July 20, 2012.

151.     On July 31, 2012, Plaintiff had been notified that an Office of Professional

Responsibility  (OPR) investigation had been initiated by the Internal Investigations

Section, Inspection Division, against her, although she was not made aware of the

nature of the investigation. This referral was authorized by then Assistant Director

McCabe.

152.     In a signed sworn statement, McCabe admits he knew Plaintiff had filed an EEOC

complaint against the same individuals who drafted and forwarded the OPR

recommendation to McCabe for his signature.

153.     The OPR investigation and a management referral to EAP were both dated

July 20, 2012, after Schwein's threat to Plaintiff over the phone on or about June 14,

2012.

154.     The OPR charges brought against Plaintiff included insubordination, time and

attendance fraud, and disruptive behavior while on duty.

155.     The IC Civilian Joint Duty Program was established in response to the

requirement of the 2004 Intelligence Reform and Terrorism Prevention Act (IRTPA) that

service in more than one IC element is a condition for promotion to senior executive.

156.     The IC Civilian Joint Duty Program works to create cross-agency expertise by fostering an environment of information-sharing, interagency cooperation, and intelligence integration at all levels.

157.     Intelligence Community Directive (ICD) 651 "Performance Management for the IC Workforce" and ICD 656 "Performance Management for IC Seniors" specify that the gaining element is responsible for completing performance objectives and evaluations of the individual assigned to them on a Joint Duty rotational assignment.

158.     Under ICD 651 and 656, evaluations are reviewed and approved by a management official in the gaining element. The reviewing official consults with a designated point of contact from the individual's employing element and provides that official with an opportunity to review and provide additional comments regarding performance.

159.     The OPR report only briefly mentions that the FBI conducted Plaintiff's PAR and it does not mention any of the serious USG/ODNI policy violations involved in that overreach by the FBI.

160.     These violations of USG and ODNI policy were reported by Plaintiff to HRD, CTD HR, Inspection, EEOA, Office of Government Counsel (OGC), and to the CTD AD, then to Andrew McCabe via formal grievance of the PAR. The violations were ignored.

161.     Schwein indicated in multiple communications that Plaintiff did not understand her duty as a detailee position.

162.     Petrowski wrote in an email to Schwein, "Robyn clearly does not understand her role as a detailee to CTC; she suggested it was her extraordinary competence and work ethic that put her in a position of an operational role."

163.     A June 13, 2012, email from the Deputy Chief YSD stated that Plaintiff "had already contributed more than her predecessor", and if they were to line up Plaintiff's duties correctly, "we could get more bang for the buck."  Plaintiff had only been in her detailee position for 5 months, her predecessor had held the position for 18 months.

164.     The Deputy Chief also stated that YSD management was writing up a white paper in support of Plaintiff's performance and would submit the paper to her prior to submitting it to the FBI.

165.     During Plaintiff's PAR presentation, witnessed by UC Pamela Sommers and ASC Thomas Van Nuys, Schwein denied a white paper was done or being done.

166.     As a detailee, Plaintiff reported to Deputy Chief of YSD and notified Schwein and Petrowski of this on several occasions. Despite this, the YSD Deputy Chief was not requested to provide input into Plaintiff's mid-year evaluation.

167.     YSD Deputy Chief stated that Chief YSD would not be able to speak to Plaintiff's performance, as he delegated that responsibility to the Deputy Chief and was not aware of the taskings of detailees.

168.     In early March of 2012, Plaintiff and Schwein discussed attendance of the 7:15 FBI meeting and agreed Plaintiff would attend if operational and if the gaining agency (CIA) taskings were not secondary to her attendance.

169.     This agreeance was based upon the requests of Deputy Chief YSD.

170.     Plaintiff told fellow detailee Ryan Maxell about the conversation and its results; Maxell was never interviewed in the OPR or EEO investigations.

171.     Plaintiff copied Petrowski in an email regarding having worked a later shift to see if it was more aligned with the YSD mission. Plaintiff had previously discussed this with Petrowski, who had allowed Plaintiff to experiment with the later shift.

172.     Plaintiff was assigned to the CIA's Yemen Somalia Department; Yemen and Somalia have a significant time difference of hours from Washington, DC. In her time as a CIA detailee, several individuals thanked Plaintiff for not strictly working banker's hours and taking calls at any time.

173.     Plaintiff had spoken with Schwein and Petrowski in March about a varied shift, and it did not become an issue until Petrowski and Schwein started their behind the scenes retaliatory OPR claim against Plaintiff.

174.     Under ODNI policy, the gaining agency controls time and tasking, and Deputy Chief YSD repeatedly had asked Plaintiff why she was attending a 7:15am meeting at FBI CTD when it had no impact on her work at YSD.

175.     Deputy Chief YSD remarked that he wondered if he would have to overload Plaintiff with YSD assignments in order for Plaintiff to justify to Schwein that Plaintiff was needed for YSD work instead of attending FBI meetings.

176.     Plaintiff made Schwein and Petrowski aware of this issue, but they chose to ignore it.

177.     SSA Amanda Moran conducted the OPR investigation into Plaintiff.

178.     SSA Moran's review of Plaintiff's working hours was inconsistent with AVP written policy.

-27-

179.     The Law Enforcement Availability Pay Act (LEAP) policy, FBI's MAOP

regulations, and all ODNI Joint Duty Detailee policies.

180.     Plaintiff gave Inspection and OPR hard copies of proof that she regularly worked

numerous hours after leaving the CIA or FBI buildings, on weekends, nights, early

mornings before leaving her residence for work, during half marathons, and on holidays,

all covered under the Law Enforcement Availability Pay Act (LEAP).

181.     The LEAP Act was not only ignored by Inspection SSA Moran, but SSA Moran

actively misrepresented the LEAP law to OPR adjudication, who took SSA Moran's

misinterpretation as fact.

182.     SSA Moran stated in Plaintiff's interview that because Plaintiff worked National

Security matters and worked on her Blackberry and outside of the buildings, that time

was not counted towards her Availability Pay.

183.     Later on, in the ROI, Petrowski stated that Plaintiff had notified him that on the

second day of meetings during a trip to San Diego, the other individuals had ditched

Plaintiff, so she went for a run on the beach, went shopping, and kicked back and had a

beer.

184.     Petrowski's statement is wholly untrue; there was no second day of meetings in

San Diego scheduled. Plaintiff did not run on the beach, go shopping, or "kick back and

have a beer."

185.     Plaintiff was not disinvited to any meetings in San Diego. In reality, Plaintiff had

lunch with Agency personnel and stayed late in the office with senior Agency personnel,

later receiving an email from that senior agency individual on how helpful the discussion

was.

186.     During the course of the EEO case, several people had approached Plaintiff unsolicited to inform her that Tom Petrowski has a pattern of discriminatory and retaliatory behavior, specifically using time card fraud to target those he did not like, specifically minorities.

187.     Plaintiff was advised by additional parties that Petrowski had targeted those he did not like with time card fraud while deployed to Iraq and when in the Dallas Division.

188.     Plaintiff spoke with several co-workers who expressed dislike for Petrowski's demeaning treatment.

189.     When Plaintiff attempted to explore these accounts regarding Tom Petrowski relevant to her EEO claim, SSA Amanda Moran told Plaintiff that she would face additional charges from OPR if she was seen as obstructing the OPR investigation.

190.     Plaintiff was effectively stopped from examining issues pertinent to her EEO complaint and threatened with additional administrative charges by SSA Moran.

191.     Petrowski states co-workers were upset Plaintiff was not working long hours.

192.     Plaintiff routinely stayed later than the rest of the detailees, as the mission and operations of YSD took place later in the day, into the evening.

193.     Petrowski denies excuses for Plaintiff's absences, calling them suspect at best, despite Plaintiff providing many medical notes due to several complications with diverticulosis, a covered physical disability.

194.     Many of Plaintiff's days off which were scrutinized in the OPR were scheduled in advance due to half marathons and other races Plaintiff had signed up for.

195.     Plaintiff is an active and avid half marathon racer and participated in approximately six half marathons in the short span she served as detailee.

196.     On several occasions, Plaintiff answered work-related calls mid-race and assisted with critical and pressing matters.

197.     Plaintiff has received unsolicited feedback from individuals in the FBI, CIA, and DOD regarding her outstanding professionalism, her ability to work very diplomatically within the interagency, and her ability to reach her at all hours on any day.

198.     The names and contact numbers of individuals who requested to speak on Plaintiff's behalf were given to former DAD Ley and SSA Moran. These individuals would have provided a narrative contrary to that of Schwein, Petrowski, McCabe, and others who testified against plaintiff.

199.     The OPR ignored the list of witnesses Plaintiff gave them; Plaintiff's witnesses were never interviewed.

200.     SSA Moran inquired about Plaintiff's contact with Special Agent Michael Dick, who Plaintiff contacted for advice on retaining an EEO attorney.

201.     SSA Moran alleged that Plaintiff was seeking to avoid OPR's investigative techniques because Plaintiff did not want SSA Moran inquiring into her EEO claim.

202.     Plaintiff advised SSA Moran that avoiding detection was not the intent of the conversation, but SSA Moran included this into the statement she wanted Plaintiff to sign.

203.    After Plaintiff modified the statement to reflect the truth, Moran said the statement was not consistent with Plaintiff's interview.

204.    SSA Moran wrote in Plaintiff's statement that Plaintiff had admitted to being an alcoholic. This was untrue and displayed a lack of candor by SSA Moran; Plaintiff had stated that she was the adult child of an alcoholic and was working through these issues with the proper 12 step group for just such an issue.

205.    Petrowski and Schwein alleged that Plaintiff was sending out frivolous texts late at night, but have not provided the text messages so that their characterization may be questioned.

206.    SSA Moran insinuated that Plaintiff had met with an admiral because she "wanted to date him."

207.    SSA Moran's insinuation reflects how Plaintiff was portrayed to OPR by Schwein and Petrowski.

208.    The meetings with the admiral had occurred over four years prior to the OPR investigation.

209.    One meeting with the admiral occurred while Plaintiff and the admiral worked together on the National Security Council's Hostage Working Group, discussing a priority case operation.

210.    A second meeting occurred when Plaintiff waited for the admiral and his wife following his admiral pinning ceremony. At the time, Plaintiff advised FBI Deputy Director Pistole of her meetings and work with the admiral to further the FBI's operations.

211.     Pistole maintained Plaintiff as his point of contact for the case and commended her on building the relationships with the interagency for the case.

212.     The individual who made the supposition to OPR regarding the second meeting was aware of the working relationship and meetings, but misrepresented the issue and employed discriminatory tactics to further harm Plaintiff's reputation.

213.     SSA Moran questioned Plaintiff's motive for bringing up the ODNI policies defining detailee duties, responsibilities, and performance ratings was retaliation. Moran stated that it would be retaliatory towards Schwein and Petrowski.

214.     SSA Moran informed that she had heard Plaintiff tell Schwein and Petrowski if they filed the OPR, Plaintiff would go to EEO.

215.     Plaintiff had an informal EEO contact regarding discrimination and harassment on June 15, 2012. The OPR against Plaintiff was filed over five days later on June 20, 2012.

216.     Petrowski's statement implied that Plaintiff sent emails to Dave Franco, a now retired FBI agent, without knowing him, which characterized Plaintiff as unstable and led to biased adjudication of the case.

217.     In actuality, Plaintiff and Franco had known each other for years and had traveled to Iraq and Afghanistan together.

218.     Franco and Plaintiff regularly discussed personal matters, as they were friends and talked outside of work.

219.     Further, Petrowski falsely stated that the email in question came out of the blue.

220.     The email in question was a response to Franco, who had asked Plaintiff a question about how things had gone with Captain John Burnham.

221.     Petrowski stated that Franco said Plaintiff had copied someone in the chain of command of Captain Burnham, the subject of the email.

222.     Plaintiff had copied several friends to the email, none of whom were in active service, and none of which were in Captain Burnham's chain of command.

223.     In the OPR referral, authored by Schwein, it states that Plaintiff copied Burnham's chain of command in the email.

224.     No individual in Burnham's chain of command was copied to the email in question. Only personal friends of Plaintiff, outside Burnham's chain of command, were copied to the email.

225.     Petrowski and Schwein provided statements regarding the email in question which lacked candor, thus misrepresenting the facts to OPR.

226.     The OPR investigation into Plaintiff was not aligned with written MAOP policy for disciplinary investigation.

227.     MAOP explicitly states the reason to conduct an OPR investigation is to find the truth.

228.     The OPR investigation into Plaintiff excluded exculpatory documentation, failed to interview pertinent witnesses such as Plaintiff's direct supervisor at the CIA and other relevant coworkers, and negated emails and letters written on Plaintiff's behalf which presented exculpatory information.

229.     The OPR investigation into plaintiff allowed one interviewee, Captain John

Burnham, the opportunity to change his statement in reaction to documented proof

Plaintiff had provided that showed the original statement was fabricated.

### *Plaintiff's Final Months at FBI (March 1, 2013 - August 2013)*

230.     Plaintiff filed four requests for reasonable accommodations dated March 1, 2013,

supported by her physician and additional documentation.

231.     Plaintiff submitted documentation from her Gastroenterologist with the

physician's detailed explanation of FMLA reasons for one request. Plaintiff provided

additional justification from two other doctors, all citing legitimate reasons Plaintiff

required reasonable accommodations.

232.     On May 13, 2013, Plaintiff received notice that the Reasonable Accommodation

Committee (RAC) convened on April 23, 2013 and reviewed her requests. The written

response stated that based on medical information submitted to support Plaintiff's

request, a determination could not be made as to whether Plaintiff is a qualified

individual with a disability at this time.

233.     On March 23, 2013, Plaintiff filed an FD-766 Voluntary Leave Program Request

for Approval as Leave Recipient. Plaintiff filed due to her recent diverticulitis attack and

loss of work noted by physicians. This request was ignored. Plaintiff further filed for

Family Medical Leave Act (FMLA) coverage in a WH-280, to justify FMLA leave

coverage for her. This was approved.

234.    Plaintiff had been ordered out of work periodically by her doctors due to diverticulitis. Van Nuys complained about Plaintiff's use of leave.

235.    Plaintiff felt forced to take leave without pay in an effort to stay in the positive with sick leave and work hours at her menial assignment.

236.    On April 29, 2013, Plaintiff submitted her accomplishments to her rating official, ASC Thomas Van Nuys, for the mid-year performance review required for each employee.

237.    On April 30, 2013, the Unit Chief (UC) of the Plaintiff's current unit had Plaintiff sign the Performance Review portion on her Performance Plan. That UC, Rodrigo Vargas, was leaving in two weeks and was not Plaintiff's rating official. Vargas was upset with having to be the messenger of this request for a signature.

238.    Thomas Van Nuys did not reply to Plaintiff's email regarding the mid-year progress review. Plaintiff remained unsure who her rating official was, despite asking multiple times.

239.    On May 1, 2013, Plaintiff noted that professional connections made during her detailee position did not return to her communications any longer. Plaintiff's former colleagues had been guided not to speak with her.

240.    On May 1, 2013, Plaintiff became aware that Schwein was receiving an award from the CIA for his work done at that agency.

241.    During Schwein's time at the CIA, he claimed responsibility for Plaintiff's accomplishments in his PAR.

242.    In SC Schwein's SES PAR narrative, Schwein stated that there was one unfounded EEO complaint in response to an OPR.

243.     Plaintiff began the informal EEO process before the OPR was filed, and

Plaintiff filed the formal EEO complaint about a month before she became aware of the

OPR.

244.     On June 13, 2013 and June 21, 2013, Plaintiff attempted to secure a position

outside of the Division to avoid filing an EEO, in fear of further retaliation.

245.     In August of 2013, Plaintiff was suspended without pay and resigned due to

extreme complications from her diverticulosis, extreme anxiety and depression from the

repeated retaliation against her, and in an effort to gain access to the money in her Thrift

Savings Fund to pay bills.


### *Plaintiff's Attempts at Administrative Relief (August 2013 - Present)*

246.     The first heavily redacted Report of Investigation (ROI) issued by the EEOC

investigation was dated April 5, 2013**.**

247.     That ROI contained extensively redacted information, even including Plaintiff's

own statement as well as the issues accepted for investigation.

248.     The redactions of that ROI were not consistent with the Controlled Access

Program Coordination Office's classification guidelines, which are standard for the U.S.

Government.

249.     On March 31, 2014, Plaintiff filed a Motion for Discovery, requesting regular

discovery and an un-redacted Report of Investigation.

250.     On May 16, 2014, Plaintiff retained legal representation by Marc Cohen. Cohen notified the EEOC Administrative Judge that he represented Plaintiff and included a letter which primarily requested more time to prepare to litigate the case.

251.     On the following Monday, May 19, 2014, the FBI filed the Agency's Motion to Dismiss with no prior notice to Cohen. The heavily redacted ROI with a "burned to CD date" of June 10, 2013, was attached to the motion.

252.     In the Motion to Dismiss, the FBI argued that because Mark Cohen was representing Plaintiff and did not have FBI security clearance, a significant delay would result unless the matter was remanded to the CAO for a Final Agency Decision.

253.     This heavily redacted ROI disregarded FBI written policies, Office of Directorate of National Intelligence Joint Duty Detailee Guidance/Memorandum, and CIA written policies.

254.     The ROI states that the Plaintiff failed to provide names of witnesses in her sworn statement. Plaintiff's statement contains witness names on pages 8-11.

255.     Complainant Gritz emailed this list of witnesses to the EEO investigator separately.

256.     Of the 13 witness names provided by Plaintiff, the EEO investigator only interviewed 5, all of which were the RMOs interviewed in the retaliatory OPR.

257.     If the EEO investigator performing the ROI had interviewed the other 8 witnesses, those witnesses would have provided information contrary to the narrative presented by RMOs Schwein, Petrowski, Ley, and McCabe.

258.     The ROI did not consider exculpatory evidence which would have served as a direct rebuttal for the very issues that were spuriously raised against Plaintiff.

259.     Plaintiff's counsel at the time, Cohen, filed a motion that same day to withdraw the request for hearing and return the case to the Agency for issuance of a Federal Agency Decision.

260.     Plaintiff and Cohen withdrew from the request for a hearing because the redactions in the ROI were so extensive that Cohen felt it was not possible to meaningfully discuss the issues at an EEOC hearing.

261.     On November 12, 2015, a year and a half later, counsel received a transmittal letter dated November 3, 2015, stating that "upon further review of the Report of Investigation, the Federal Bureau of Investigation's (FBI) Discovery Processing Unit, Office of the General Counsel, authorized the release of additional information contained in the report."

262.     This revised ROI had more information, but still had redactions so extensive as to include the accepted issues.

263.     On March 29, 2016, Plaintiff received the Final Agency Decision (FAD).

264.     Although the ROI redactions were performed under the pretext of national security, the FAD listed all accepted issues in the subject claim with no redactions.

265.     The first time that Counsel was made aware of the accepted issues for investigation in the ROI was when he read the accepted issues listed in the FAD.

266.     The DOJ and AG, respondents in the matter, saw that there was no reason that could justify the redaction of the issues accepted for investigation. If the information required classification, the DOJ and AG would not have released them in the FAD.

267.     The inappropriate redactions within the ROI effectively coerced Plaintiff to force

the matter to FAD, depriving Plaintiff of her statutorily mandated choice to have her case

heard by an independent EEOC AJ.

268.     On, or about, August 24, 2018, Plaintiff's EEOC Office of Federal Operations

(OFO) appeal was denied.

269.     Plaintiff did not receive notice of the EEOC appeal denial until she was released

from the hospital on or about September 1, 2018.

270.     The OFO decision falsely states that Plaintiff never requested that the AJ order

the Agency to provide a less redacted copy of the ROI, or otherwise supplement the

record.

271.     Plaintiff requested an un-redacted ROI in a Discovery motion dated March 31,

2014.

272.     Plaintiff has spoken with no less than 50 EEO Complainant and FBI

Whistleblowers who have reported the same extensive redactions which effectively

violate due process.

273.     The OFO decision disregarded ODNI, FBI, CIA, and USG policies and laws

broken in the case.

274.     In a June 2018, the Office of the Inspector General (OIG) released the Review of

Gender Equity in the Department's Law Enforcement Components.

275.     The OIG Review found that the reasons female investigators at Plaintiff's level,

1811 class, frequently didn't file EEO complaints despite perceived discrimination are:

fear of retaliation, loss of position, and the length of the process.

## FIRST CAUSE OF ACTION:
## UNLAWFUL RETALIATION IN VIOLATION OF TITLE VII
## OF THE CIVIL RIGHTS ACT OF 1964, AS AMENDED

276.     Plaintiff realleges and incorporates by reference each allegation 1-275 contained in the preceding paragraphs as if fully set forth herein.

277.     The FBI discriminated against Plaintiff on the basis of Plaintiff's opposition to the defendant's unlawful gender discrimination when she filed a formal discrimination complaint against the defendant through the EEO process.

278.     Because Plaintiff's opposition to the defendant's gender discrimination was a motivating factor and made a difference in the retaliatory actions to which Plaintiff was subjected by her supervisors, including Rick Schwein, Thomas Petrowski, Marilou Felder, Thomas Van Nuys, Jenny Ley and Andrew McCabe, the defendant violated Title VII of the Civil Rights Act of 1964, as amended.

279.     Because Plaintiff's participation in EEOC proceedings which she initially filed against Rick Schwein and Thomas Petrowski was a motivating factor and made a difference in the retaliatory actions to which Plaintiff was subjected by his supervisors, including Rick Schwein, Thomas Petrowski, Marilou Felder, Thomas Van Nuys, Jenny Ley, and Andrew McCabe, the defendant violated Title VII of the Civil Rights Act of 1964, as amended.The defendant engaged in retaliation against Plaintiff with malice or reckless indifference to Plaintiff's rights under Title VII of the Civil Rights Act of 1964, as amended.

280.     As a result of the unlawful retaliation, Plaintiff has suffered emotional distress.

281.     As a result of the unlawful retaliation, Plaintiff has suffered financial losses, as to

be proven at trial.

**SECOND CAUSE OF ACTION:**
**UNLAWFUL RETALIATION IN VIOLATION OF THE ADEA**

282.     Plaintiff realleges and incorporates by reference each allegation 1-281 as

contained in the preceding paragraphs as if fully set forth herein.

283.     The FBI discriminated against Plaintiff on the basis of Plaintiff's opposition to

the defendant's unlawful age discrimination when she filed a formal discrimination

complaint against the defendant through the EEOC process.

284.     Because Plaintiff's opposition to the defendant's age discrimination was the cause

for the retaliatory actions to which Plaintiff was subjected by her supervisors, including

Rick Schwein, Thomas Petrowski, Marilou Felder, Thomas Van Nuys, Jenny Ley, and

Andrew McCabe, the defendant violated the provisions of the Age Discrimination In

Employment Act.

285.     Because Plaintiff's participation in EEOC proceedings which she initially filed

against Rick Schwein and Thomas Petrowski was the cause for the retaliatory actions to

which Plaintiff was subjected by her supervisors, including Rick Schwein, Thomas

Petrowski, Marilou Felder, Thomas Van Nuys, Jenny Ley, and Andrew McCabe, the

defendant violated the provisions of the Age Discrimination In Employment Act.

286.     The defendant engaged in retaliation against Plaintiff with malice or reckless

indifference to Plaintiff's rights under the Age Discrimination In Employment Act.

287.     As a result of the unlawful retaliation, Plaintiff has suffered emotional

distress.

288.     As a result of the unlawful retaliation, Plaintiff has suffered financial losses, as to

be proven at trial.

**THIRD CAUSE OF ACTION:**
**UNLAWFUL RETALIATION IN VIOLATION OF**
**THE REHABILITATION ACT**

289.     Plaintiff realleges and incorporates by reference each allegation 1-288 contained

in the preceding paragraphs as if fully set forth herein.

290.     The FBI discriminated against Plaintiff on the basis of Plaintiff's opposition to

the defendant's unlawful perceived disability discrimination when she filed a formal

discrimination complaint against the defendant through the EEO process.

291.     Because of Plaintiff's opposition to the FBI's discrimination against a perceived

disability was the cause for the retaliatory actions to which Plaintiff was subjected by her

supervisors, including Rick Schwein, Thomas Petrowski, Marilou Felder, Thomas Van

Nuys, Jenny Ley, and Andrew McCabe, the FBI violated the provisions of the

Rehabilitation Act.

292.     Because of plaintiff's participation in EEO proceedings which she initially

initiated against Rick Schwein and Thomas Petrowski was the cause for those retaliatory

actions to which Plaintiff was subjected by her supervisors, including Rick Schwein,

Thomas Petrowski, Marilou Felder, Thomas Van Nuys, Jenny Ley, and Andrew McCabe,

the defendant violated the provisions of the Rehabilitation Act.

293.     The defendant engaged in retaliation against Plaintiff with malice or reckless

indifference to Plaintiff's rights under the Rehabilitation Act.

294.     As a result of the unlawful retaliation, Plaintiff has suffered emotional

distress.

295.     As a result of the unlawful retaliation, Plaintiff has suffered financial losses, as to

be proven at trial.

**FOURTH CAUSE OF ACTION:**
**UNLAWFUL RETALIATORY HOSTILE WORKPLACE**
**ENVIRONMENT IN VIOLATION OF TITLE VII OF**
**THE CIVIL RIGHTS ACT OF 1964, AS AMENDED**

296.     Plaintiff realleges and incorporates by reference each allegation 1-295 contained

in the preceding paragraphs as if fully set forth herein.

297.     Title VII proscribes subjecting an employee to a retaliatory hostile work

environment for engaging in opposition to what she reasonably and in good faith believes

constitutes conduct proscribed by Title VII.

298.     When the many events discussed above took place, FBI was an "employer" within

Title VII's meaning.

299.     When the events discussed above took place, Plaintiff was an "employee" within

Title VII's meaning.

300.     FBI created and maintained an abusive environment in which retaliatory

intimidation, ridicule, and insult were so severe and pervasive that it altered the

conditions of Plaintiff's employment and created a retaliatory hostile work environment,

in violation of Title VII.

301.     FBI is vicariously liable for the actions of every FBI management actor named

in this Complaint. FBI has directly and proximately caused Plaintiff substantial

economic loss, damage to her career and professional reputation, humiliation, pain, and

suffering.

302.     Plaintiff has also suffered stress, anxiety, and depression as a result of the

retaliatory hostile work environment. FBI's actions were wanton, reckless, or in willful

indifference to Plaintiff's rights.


**FIFTH CAUSE OF ACTION:**
**UNLAWFUL SEX/GENDER DISCRIMINATION & HOSTILE WORK**
**ENVIRONMENT IN VIOLATION OF TITLE VII OF**
**THE CIVIL RIGHTS ACT OF 1964, AS AMENDED**

303.     Plaintiff realleges and incorporates all allegations 1-302 contained in the

preceding paragraphs as if fully set forth herein.

304.     The FBI's conduct, as described in this Complaint, constituted discrimination on

the bases of gender, in violation of Title VII of the Civil Rights Act of 1964, as amended,

and its implementing regulations.

305.     The FBI violated the law when it subjected Plaintiff to harassment and

discrimination with regard to performance ratings, non-selection for promotion, work

assignments, and reassignments based on her gender.

306.     The FBI violated the law when it subjected Plaintiff to harassment and

discrimination with regard to constant slander against Plaintiff including multiple

insinuations by FBI management officials that Plaintiff "wanted to date" male

colleagues, accusations that Plaintiff giggled when discussing serious matters, was

emotional, took things personally, and other gender stereotyped accusations.

-44-

307.    The FBI treated male employees more favorably than the FBI treated

Plaintiff.

308.    In sum, Plaintiff was exposed to disadvantageous terms or conditions of

employment to which male employees were not exposed.

309.    As a result of the intolerable working conditions and Defendant's actions, Plaintiff

has suffered economic and noneconomic damages in the past and continuing through the

present.

**SIXTH CAUSE OF ACTION:**
**CONSTRUCTIVE DISCHARGE IN VIOLATION OF TITLE VII OF**
**THE CIVIL RIGHTS ACT OF 1964, AS AMENDED**

310.    Plaintiff realleges and incorporates the allegations set forth in the preceding

paragraphs 1-309 as if fully set forth herein.

311.    As already described, the FBI's discrimination, retaliation, and other unfavorable

treatment of Plaintiff caused her working conditions to become intolerable.

312.    Plaintiff reasonably concluded that she had no option but to end her employment

with the FBI.

313.    As a result of the intolerable treatment by the FBI, Plaintiff suffered physical and

emotional distress.

314.    Given the ongoing hostility and retaliation she experienced at work, Plaintiff's

working conditions were intolerable.

315.    FBI's failure to ensure tolerable working conditions free of discrimination,

harassment and retaliation was intentional, malicious, deliberate, willful and oppressive,

and was carried out with the intent to cause Plaintiff to resign her position at FBI.

316.      Plaintiff was effectively forced to resign her position in August 2013.

317.      FBI's wrongful and illegal conduct caused Plaintiff injury including, but not

limited to, lost income (past and future), lost benefits, emotional distress and physical

injury.

## PRAYER FOR RELIEF

### As to the First, Third, Fourth, Fifth, and Sixth Causes of Action

a.   Declare the conduct engaged by the defendant to be in violation of Plaintiff's

rights.

b.   Enjoin the defendant from engaging in such conduct.

c.   Award plaintiff the equitable relief of back pay and benefits, together with prejudgment

interest for the entire period as well as front salary and benefits accrual.

d.   Award plaintiff compensatory damages for an amount to be proved at trial.

e.   Award plaintiff costs and attorney fees.

f.   Grant such other and further relief as the Court may deem just and proper.

### As to the Second Cause of Action

a.   Declare the conduct engaged by the defendant to be in violation of Plaintiff's

rights.

b.   Enjoin the defendant from engaging in such conduct.

c.   Award plaintiff the equitable relief of back pay and benefits, together with prejudgment

interest for the entire period as well as front salary and benefits accrual, for an amount to

be determined at trial.

d.   Award plaintiff liquidated damages.

-46-

e.   Award plaintiff costs and attorney fees.

f.   Grant such other and further relief as the Court may deem just and proper.

### JURY DEMAND

Plaintiff requests a trial by jury for all issues so triable.

Respectfully submitted,

July 14, 2019                                          **BARNES LAW**

                                                       */s/  Derek Jordan*
                                                       Derek Jordan, Esq.
                                                       Tennessee Bar #34299
                                                       Admission *Pro Hac Vice*

                                                       BARNES LAW
                                                       601 South Figueroa Street – Suite 4050
                                                       Los Angeles, CA  90017
                                                       (310) 510-6211          Fax (310) 510-6225
                                                       derekjordan@barneslawllp.com
                                                       **Attorneys for Plaintiff Robyn Gritz**


July 14, 2019                                          **KLIMASKI & ASSOCIATES, P.C.**

                                                       */s/  James R. Klimaski*
                                                       James R. Klimaski, #243543

                                                       Klimaski & Associates, P.C.
                                                       1717 N Street NW – Suite 2
                                                       Washington, DC  20036-2827
                                                       202-296-5600    Fax 202-296-5601
                                                       Klimaski@Klimaskilaw.com
                                                       **Local Counsel for Plaintiff Robyn Gritz**