UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ROBYN L. GRITZ, | |
| Plaintiff, | Civil Action No. 18-cv-02712 (JMC) |
| v. | |
| MERRICK B. GARLAND, | |
| Defendant. | |

**MEMORANDUM OPINION**

Plaintiff Robyn Gritz alleges that she experienced discrimination based on her gender, age, and disability while employed at the Federal Bureau of Investigation (FBI).[1] Defendant filed a Motion to Dismiss. The Court grants Defendant's Motion with respect to Gritz's discrimination and retaliation claims, but denies the Motion with respect to Gritz's hostile work environment and constructive discharge claims.

**I.    BACKGROUND**

In 1997, Robyn Gritz began a distinguished career with the FBI. ECF 29 ¶¶ 15–16. She initially worked at the Newark Division and, for a time, as the relief supervisor on a Joint Terrorism Task Force. *Id.* ¶¶ 17–18. In October 2004, Gritz was promoted to Supervisory Special Assistant (SSA) at the FBI Headquarters in the Counterterrorism Division (CTD) International Operations Section One. *Id.* ¶ 19. She was promoted again in October 2006, but returned to the CTD in November 2007 to serve as an SSA in the CT Extraterritorial Squad. *Id.* ¶¶ 24–26. There, she led

---

[1] Unless otherwise indicated, the formatting of quoted materials has been modified throughout this opinion, for example, by omitting internal quotation marks and citations, and by incorporating emphases, changes to capitalization, and other bracketed alterations therein. All pincites to documents filed on the docket are to the automatically generated ECF Page ID number that appears at the top of each page.

1

numerous projects, including investigations into the Blackwater shooting in Iraq, the assassination of Benazir Bhutto in Pakistan, and attacks on U.S. embassies in Lebanon and Yemen. *Id.* ¶ 28. In December 2009, Gritz received yet another promotion, becoming the GS-15 Unit Chief of the Executive Strategy Unit, Weapons of Mass Destruction Directorate. *Id.* ¶ 31.

In January 2012, Gritz was assigned as Senior Liaison Officer, a designated Joint Duty Detailee, to the CIA's Counterterrorism Center (CTC) in the Yemen/Somalia Department (YSD). *Id.* ¶ 35. While Gritz served in this position, her supervisor and a colleague—Richard Schwein and Thomas Petrowski, respectively—allegedly made a number of sexist comments to her. *See, e.g., id.* ¶¶ 35–46. They repeatedly brought up Gritz's divorce, suggested that she would prefer a "less stressful" job because of her age, and made other statements that "singled [her] out as a member of any number of protected classes." *Id.* ¶ 41.

When Schwein was temporarily transferred to a different city in May 2012, he selected Petrowski to serve as the Acting Senior Executive Service (SES), despite Gritz having more seniority. *Id.* ¶¶ 47–50. When Petrowski assumed this new position, the interactions between Gritz and Petrowski worsened. Petrowski yelled at Gritz for not seeking his approval before traveling for a conference and accused her of attending another conference just to "meet Navy SEALS." *Id.* ¶¶ 60, 64. Gritz reported these incidents to Schwein, but Schwein insisted that Gritz follow Petrowski's command. *Id.* ¶ 66. Petrowski's demeanor toward Gritz persisted. *Id.* ¶ 67. Gritz requested to have an Ombudsman present at all future meetings with Schwein and Petrowski, but Schwein responded to this request by threatening to "pull her timecards if she wanted to go that route." *Id.* ¶¶ 68–69.

On June 14, 2012, Schwein emailed Petrowski, "What do you think about a referral to OPR for T&A fraud. Is there enough here to make that case?" *Id.* ¶ 71. Petrowski replied twenty minutes

later: "Let's talk at your convenience. I have someone in OPR looking at this offline and will have a solid opinion from them today." *Id.* ¶ 72. A few days later, on June 20, 2012, Schwein and Petrowski referred Gritz to the Employee Assistance Program and the Office of Professional Responsibility. *Id.* ¶ 78. The OPR referral alleged that Gritz was insubordinate, had committed time and attendance fraud, and engaged in disruptive behavior while on duty; Gritz contends these allegations were false and made to harass her. *Id.* ¶¶ 91–92, 157. Gritz alleges that Petrowski had a history of leveling similar false allegations to target members of protected classes that he did not like. *Id.* ¶¶ 176–77. That same week, Gritz met informally with an FBI Equal Employment Opportunity counselor to discuss Schwein's and Petrowski's behavior, then filed an EEO complaint against Schwein, Petrowski, and Assistant Director Andrew McCabe, alleging that she was discriminated against based on her sex, age, and disability. *Id.* ¶¶ 51, 81.

On July 3, 2012, Gritz was notified that she would be relieved of her duties at the CIA Counterterrorism Center. *Id.* ¶ 98. She was transferred back to the Counterterrorism Division (CTD), where she was given administrative assignments that she alleges were below her GS-15 classification. *Id.* ¶¶ 99–100, 103–07. Months went by without Gritz receiving an assignment. *Id.* ¶ 108.

When the time came for Gritz's Performance Appraisal Report to be completed, Gritz asked for Schwein not to be involved. *Id.* ¶ 118. Gritz reasoned that she had not worked for him for half of the rating period, and he knew that she had filed an EEO complaint against him. *Id.* ¶ 119. Additionally, Gritz noted that the OPR referral had instructed Gritz to refrain from contact with Schwein. *Id.* Nevertheless, Schwein completed her Performance Appraisal Report. *Id.* ¶ 120. For the first time in her sixteen-year career, Gritz was rated below "Excellent" and "Outstanding."

*Id.* ¶ 132. Schwein also commented that Gritz was unprofessional because she took things personally and was too emotional. *Id.* ¶ 121.

Gritz began to seek a lateral transfer in November 2012. *Id.* ¶ 143. But McCabe denied one of Gritz's transfer requests and sent negative reviews of Gritz to every other position for which she applied. *Id.* ¶¶ 144, 147.

Meanwhile, the OPR investigation against Gritz continued. Gritz alleges that the investigation accepted false narratives provided by Schwein and Petrowski and rejected attempts by Gritz to demonstrate her competency. *Id.* ¶¶ 169–71. For example, Amanda Moran, the SSA tasked with conducting the interview, suggested to Gritz that she had met with an admiral because she "wanted to date him," but Moran refused to contact individuals who offered to substantiate Gritz's version of events. *Id.* ¶¶ 179–80, 187, 194.

Gritz filed a formal EEOC complaint on September 14, 2012.[2] ECF 30-2 at 2. She alleged that she had been discriminated against based on her sex, age, and a perceived mental disability. *Id.* She also alleged unlawful reprisal. *Id.*; ECF 29 ¶ 122. The EEOC issued a heavily redacted Report of Investigation in April 2013. *Id.* ¶ 214. Gritz initially requested a hearing to litigate findings in the Report, but eventually withdrew her request because her attorney felt the extensive redactions would make the hearing unproductive. *Id.* ¶ 228. Gritz received the Final Agency Decision on March 29, 2016. *Id.* ¶ 231. Her appeals were denied. *Id.* ¶ 236.

In August 2013, while the EEOC proceedings were ongoing, Gritz was suspended without pay. ECF 29 ¶ 212. She ultimately resigned in order to access money needed to pay her bills. *Id.* ¶ 213.

---

[2] Gritz alleges that she filed her formal EEO complaint on August 14, 2012. ECF 29 ¶ 122. But the EEO charge itself says that it was filed on September 14, 2012. *See* ECF 30-2 at 2. The Court assumes that Gritz's Second Amended Complaint simply erred in identifying the date, and assumes that September 14, 2012, is the correct date.

On November 20, 2018, Gritz sued Defendant in this Court. In her Second Amended Complaint, she alleges that Defendant violated Title VII of the Civil Rights Act of 1964 by discriminating against her based on her gender, creating a hostile work environment, and effectuating a constructive discharge. *Id*. ¶¶ 282–303. She also alleges that Defendant retaliated against her for reporting the discrimination, in violation of Title VII, the Age Discrimination in Employment Act (ADEA), and the Rehabilitation Act. *Id.* ¶¶ 261–81. Defendant filed a Motion to Dismiss. ECF 30. Plaintiff responded, ECF 34, and Defendant replied, ECF 36.

## II.   LEGAL STANDARD

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A complaint has facial plausibility when a plaintiff pleads all of the elements of their claim and supports those elements with enough factual allegations to "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Also, courts must "assume [the] veracity" of any "well-pleaded factual allegations" in a complaint. *Id.* at 679.

## III.   ANALYSIS

Defendant's Motion to Dismiss sets forth multiple arguments for dismissing Gritz's claims. The Court addresses each in turn.

### A.  FRCP 8

Defendant contends that Gritz's Second Amended Complaint fails to satisfy the pleading standards set forth in Federal Rule of Civil Procedure 8. That Rule requires pleadings to be "simple, concise, and direct" and contain "a short and plain statement of [each] claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2), 8(d)(1). Defendant argues that Gritz's 62-page complaint alleges a "laundry-list of issues and disputes" without connecting those factual

5

allegations to legal claims. ECF 30-1 at 18–20. Gritz disagrees, arguing that whatever defects may have existed in prior versions, the Second Amended Complaint satisfies Rule 8 by giving Defendant fair notice of the claims against it. *See* ECF 34 at 20–22.

The Court concludes that the Second Amended Complaint clears Rule 8's pleading threshold. True, it is a lengthy complaint, and that expanse is due in part to repetitive allegations and extraneous information. But a little excess does not spoil a pleading. The surplus information in Gritz's Second Amended Complaint does not make the Complaint unintelligible. The additional details can be ignored without impairing Defendant's ability to discern the claims against it.

Defendant also has fair notice of the allegations against which it must defend because each claim in the Second Amended Complaint includes a "short and plain statement" outlining the basis of the claim. *See* Fed. R. Civ. P. 8(a)(2). For example, Gritz's first claim alleges unlawful retaliation in violation of Title VII of the Civil Rights Act of 1964. *See* ECF 29 ¶¶ 261–67. Specifically, Gritz names six individuals who she believes retaliated against her for filing an EEO complaint based on gender discrimination. *Id.* ¶¶ 262–63. As Defendant notes, Gritz does not identify the specific actions these individuals took. *See* ECF 30-1 at 19. But she includes that information in the narrative section. Given the numerous instances of retaliation that Gritz alleges took place, it would be impossible for Gritz to keep her claim "short and plain" while re-alleging every retaliatory action discussed earlier in the Complaint.

The claims included in the Second Amended Complaint give Defendant fair notice of the claims against it by providing enough details—like the names of individuals who committed the retaliatory actions—for Defendant to match the basis for each claim to the factual allegations set forth in the Complaint. Accordingly, the Court will not dismiss Plaintiff's Complaint on this ground.

### B. Retaliation Claims

Gritz alleges that Defendant retaliated against her in violation of Title VII, the Age Discrimination in Employment Act, and the Rehabilitation Act. *Id.* ¶¶ 261–81. Gritz's EEO complaint included allegations of retaliation, *Id.* ¶ 122; ECF 30-2 at 2, but her Second Amended Complaint and Opposition to Defendant's Motion to Dismiss make clear that her retaliation claims in this action are limited to alleged misconduct that followed her EEO filing. *See* ECF 34 at 23–25; *see also* ECF 29 ¶¶ 262, 264, 269, 271, 276, and 278 (alleging retaliation because she "filed a formal discrimination complaint against the defendant through the EEO process" and "participat[ed] in EEOC proceedings"). Defendant argues that Gritz's retaliation claims should be dismissed because Gritz failed to exhaust her administrative remedies. ECF 30-1 at 21–25. The Court agrees and grants Defendant's Motion to Dismiss.

Federal employees must exhaust their administrative remedies before filing a lawsuit alleging violations of Title VII, the ADEA, or the Rehabilitation Act. 42 U.S.C. § 2000e-16(c) (Title VII); 29 U.S.C. § 633a(b)–(d) (ADEA); *Spinelli v. Goss*, 446 F.3d 159, 162 (D.C. Cir. 2006) (holding that the Rehabilitation Act mandates administrative exhaustion). The procedures for exhausting a claim under each of these three statutes are laid out in the Code of Federal Regulations. *See* 29 C.F.R. § 1614. If a defendant argues in a 12(b)(6) motion that a plaintiff failed to exhaust administrative remedies, then the defendant bears the burden of pleading and proving this affirmative defense. *Bowden v. United States*, 106 F.3d 433, 437 (D.C. Cir. 1997). A plaintiff can rebut the defendant's argument by pleading and proving their own set of facts showing that the plaintiff is entitled to avoid the defense. *Id.*

Defendant argues that Gritz did not exhaust her retaliation claims because she did not file another EEO complaint (or revise her initial complaint) to include these claims after the FBI allegedly retaliated against Gritz for filing her EEO complaint. *See* ECF 30-1 at 21–25. This

7

satisfies Defendant's initial burden in asserting an exhaustion defense for purposes of its Motion. If Gritz alleges that the FBI retaliated against her for filing an EEO complaint, she cannot base her retaliation claim on discrimination that occurred before she filed that complaint. And because she never filed a subsequent EEO complaint, she did not exhaust her administrative remedies for the retaliatory actions that occurred after she filed her EEO complaint.

In her Opposition to Defendant's Motion to Dismiss, Gritz argues that the FBI had "obstructed" her attempts to exhaust her administrative remedies by misleading Gritz as to those procedures. *See* ECF 34 at 33–34. This sounds like an estoppel argument, which is a valid rebuttal to an exhaustion defense. *Bowden*, 106 F.3d at 437 (noting that exhaustion requirements are subject to estoppel). But Gritz fails to proffer a viable estoppel argument to convince the Court that the case should proceed to discovery. Although Gritz argues that the FBI hindered and delayed her efforts to exhaust her remedies, she does not contend that the FBI precluded her from exhausting her administrative remedies altogether.[3] Therefore, even if tardy, Gritz would still be expected to eventually complete that prerequisite before suing in federal court. Because Gritz does not allege that she filed a subsequent EEO complaint or revised her initial EEO complaint after she experienced retaliation, or offer anything to explain how the Defendant prevented her from doing so at any time, Gritz did not exhaust her administrative remedies as to her retaliation claims.

At various points, Gritz notes that she attempted to exhaust her administrative remedies before she filed her EEO complaint. *See, e.g.*, ECF 34 at 26. But Gritz's pre-filing efforts do not discharge her obligation to exhaust administrative remedies for her retaliation claims. In *National Railroad Passenger Corp. v. Morgan*, 536 U.S. 101 (2002), the Supreme Court held that plaintiffs

---

[3] Of course, Gritz may seek leave to file an Amended Complaint if she has additional factual allegations not included in her Second Amended Complaint to support a potential estoppel theory.

8

must individually exhaust every discrete discriminatory act they intend to litigate in a timely manner. *Id.* at 113–14. Although *Morgan*'s holding dealt with timeliness rather than exhaustion, its reasoning informs the exhaustion issue here: generally, every claim based on a discrete act has its own time period in which plaintiffs must exhaust their administrative remedies. If that claim is not exhausted timely, it cannot piggyback on the timely exhaustion of another claim based on a different discrete act. Thus, Gritz's EEO complaint exhausted the claims it contained, but it could not exhaust unrelated retaliation claims that were based on conduct postdating the EEO complaint's filing.

Because Gritz did not exhaust her administrative remedies for her retaliation claims, the Court grants Defendant's Motion to Dismiss as to those claims.

### C. Discrimination Claim

Gritz alleges that she was discriminated against "with regard to performance ratings, non-selection for promotion, work assignments, and reassignments based on her gender." ECF 29 ¶ 291. Defendant argues that Gritz failed to exhaust her administrative remedies for this claim because her non-selection for various jobs occurred after she had filed her EEO complaint. ECF 30-1 at 30. Therefore, Defendant argues, Gritz did not exhaust her administrative remedies because this misconduct was not included in her EEO complaint. *Id.* at 30–31.

For the same reasons it granted Defendant's Motion to Dismiss Gritz's retaliation claims, the Court grants Defendant's Motion to Dismiss Gritz's discrimination claim insofar as it rests upon non-selection to job boards. This misconduct occurred after Gritz had filed her EEO complaint, and she did not file a new EEO complaint reporting her non-selection, nor did she amend her prior EEO complaint. Additionally, any attempt by Gritz to assert an estoppel argument with regard to these incidents of discrimination fails because Gritz argues that she was delayed in

9

exhausting administrative remedies, but she does not contend that she was prevented from eventually completing the task.

### D. Hostile Work Environment Claims

Title VII of the Civil Rights Act of 1964 makes it "an unlawful employment practice for an employer . . . [to] discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). The statute prohibits a variety of discriminatory employment practices, including "requiring people to work in a discriminatorily hostile or abusive environment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993).

To state a hostile work environment claim, a plaintiff must show that their employer subjected them to "discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Baloch v. Kempthorne*, 550 F.3d 1191, 1201 (D.C. Cir. 2008) (quoting *Harris*, 510 U.S. at 21). Courts evaluate the discriminatory conduct from "the perspective of a reasonable person in the plaintiff's position" and consider the totality of the circumstances, including the frequency of the discriminatory conduct, its severity, its offensiveness, and whether it interferes with an employee's performance. *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81 (1998); *Baloch*, 550 F.3d at 1201 (citing *Faragher v. City of Boca Raton*, 524 U.S. 775, 787–88 (1998)). These standards limit Title VII's prohibitions to misconduct that alters the terms and conditions of employment, ensuring the statute does not become a "general civility code." *Faragher*, 524 U.S. at 788.

Distinct acts can be considered as part of the same hostile work environment claim if they are "adequately linked." *Baird v. Gotbaum*, 792 F.3d 166, 168 (D.C. Cir. 2015). For example, acts

that "involve the same type of employment actions, occur relatively frequently, and [are] perpetrated by the same managers" can be linked together in one claim. *Id.* at 169.

Gritz alleges enough facts to state a plausible hostile work environment claim. Plaintiff alleges that Schwein and Petrowski routinely made sexist comments to her. *E.g.*, ECF 29 ¶¶ 41, 45, 65. Despite the offensive nature of some of these comments, they are likely not enough, on their own, to state a hostile work environment claim. *See Harris*, 510 U.S. at 21. But these comments were accompanied by a series of other discriminatory acts involving Schwein and Petrowski: among other alleged misconduct, Schwein promoted Petrowski instead of Gritz, despite Gritz allegedly possessing superior qualifications, ECF 29 ¶ 50; Gritz was threatened with time and attendance fraud for reporting discriminatory activity, *id.* ¶¶ 68–69; Gritz was relieved of her duties for "not being a good fit," *id.* ¶¶ 98, 101; Gritz was reassigned to a new position with duties below her qualifications, *id.* ¶¶ 103–04, 107–08; and Schwein gave Gritz negative performance reviews in part because she was "too emotional," *id.* ¶¶ 120–21. For purposes of Gritz's hostile work environment claim, these career-related actions can be considered together because they involve the same type of employment action—namely, impeding Gritz's career opportunities—and were perpetrated by the same managers within the same two-year period.

At this early stage, Gritz has pled enough factual allegations to sustain a claim that Defendant's conduct altered the conditions of her employment. Schwein and Petrowski allegedly impaired Gritz's ability to advance her career in multiple ways over a two-year timespan. A reasonable person could feel that these actions altered the conditions of her employment. Additionally, the misconduct alleged by Gritz resembles the sort of career-focused hostile work environment claims that have been found to state a plausible claim for relief in other cases. *See, e.g.*, *Walker v. Mattis*, 319 F. Supp. 3d 267, 277 (D.D.C. 2018) (denying summary judgment where

plaintiff alleged a lack of deployment and reduction in job duties); *Wise v. Ferriero*, 842 F. Supp. 2d 120, 126 (D.D.C. 2012) (denying motion to dismiss where plaintiff alleged that threats of discipline and denials of promotion occurred after a discriminatory comment). The Court therefore denies Defendant's Motion to Dismiss as to Gritz's hostile work environment claims.

### E. Constructive Discharge Claim

Defendant argues that Gritz's constructive discharge claim should be dismissed because constructive discharge is not a standalone cause of action. ECF 30-1 at 40–41. Defendant cites cases deeming allegations of constructive discharge to be relevant to the scope of recovery, but insufficient to stand on their own. *See id.* (citing *Owens-Hart v. Howard Univ.*, 220 F. Supp. 3d 81, 97 (D.D.C. 2016); *Hammel v. Marsh USA, Inc.*, 79 F. Supp. 3d 234, 245 (D.D.C. 2015)). Whatever merit that argument may have once held, the Supreme Court's decision in *Green v. Brennan*, 578 U.S. 547 (2016), washed it away. *Green* held that the statute of limitations for a constructive discharge claim begins to run upon the employee's resignation rather than the employer's last discriminatory act. *Id.* at 550. Because a constructive discharge claim has two elements—discrimination that would compel a reasonable person to resign, and the employee's actual resignation—the Court reasoned that the employee does not have a "complete and present cause of action" until both elements are fulfilled. *Id.* at 555. The Court stated that constructive discharge counts as a cause of action, and expressly disclaimed the theory that allegations of constructive discharge can be considered only for remedial purposes. *Id.* at 558–59. In light of *Green*, this Court finds that constructive discharge can stand on its own as a theory of liability under Title VII.

Defendant also argues that Gritz fails to allege enough facts to support her constructive discharge claim. At this stage of litigation, the Court does not weigh the factual allegations set forth. It asks only whether Gritz pled enough factual content "to draw the reasonable inference that

the defendant is liable" for constructive discharge. *Iqbal*, 556 U.S. at 678. Gritz alleges that her supervisors created a discriminatory work environment by routinely making sexist comments, ECF 29 ¶¶ 41, 45, 65; and impeding her career progression, *e.g.*, *id.* ¶ 50 (denial of promotion); *id.* ¶¶ 98, 101 (relieved of job responsibilities); *id.* ¶¶ 103–04, 107–08 (reassignment to below-qualifications position); *id.* ¶¶ 120–21 (negative performance reviews). She contends that stress and anxiety caused by the discrimination resulted in serious health complications. *Id.* ¶¶ 83, 86. Yet Gritz's supervisors frustrated her attempts to leave, *id.* ¶¶ 144–49, and suspended her without pay, *id.* ¶ 212. Given this situation, a reasonable person could feel compelled to resign to escape discrimination, preserve their health, and recover income.

Finally, the Court notes that Defendant argues that Gritz should have revised her EEO complaint or filed a new complaint after resigning from the FBI. *See* ECF 36 at 12. But because Defendant raised this argument for the first time in its reply brief, the argument is waived. *Lindsey v. District of Columbia*, 879 F. Supp. 2d 87, 95 (D.D.C. 2012) (citing *In re Asemani*, 455 F.3d 296, 300 (D.C. Cir. 2006)). Additionally, the evidence that would be related to Gritz's constructive discharge claim likely overlaps with the evidence for her hostile work environment claim, so there is little inefficiency in letting both claims proceed.

In sum, the Court denies Defendant's Motion to Dismiss as to Gritz's constructive discharge claim.

## IV.   CONCLUSION

The Court grants Defendant's Motion to Dismiss as to Gritz's three retaliation claims brought under Title VII, the ADEA, and the Rehabilitation Act. The Court also grants the Motion as to Gritz's Title VII discrimination claim, insofar as that claim rests upon Gritz's non-selection to job boards after she filed her EEO complaint. Finally, the Court denies Defendant's Motion to Dismiss as to Gritz's hostile work environment claims and her constructive discharge claim.

**SO ORDERED.**

DATE: June 21, 2023

_____
Jia M. Cobb
U.S. District Court Judge
